## Jac Estate.

138

Argued October 2, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Robert M. Carson,* with him *Francis E. Criner,* for appellant.

*Harold L. Roth,* with him *Paul M. Robinson,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, November 8, 1946:

This is an appeal from the decree of the court below denying a petition that the election of Lazo Yaich to take against the will of his wife, who had died on February 17, 1944, should be stricken from the record. It was alleged that Yaich "for upwards of 25 years" had "abandoned and deserted his wife" and "furnished no support for her for one year and upwards prior to her death". At her death Mrs. Yaich left an estate said to be of the value of approximately $18,000, most of which she bequeathed to her sister, Mary Teacher, and the latter's husband, and their two children. She appointed Mrs. Teacher executrix of the estate.

Lazo Yaich and Sarah Pruginic were married in Yugoslavia on January 28, 1906, she then being about 17 years of age, and he being about 18 years of age. The husband came to this country a short time afterwards, secured steady employment in the machine shop of a steel mill, and became a citizen in 1922. In 1924 he sent transportation to his wife and she came to Pennsylvania. They lived together for about eight or nine months. The husband testified that his wife left him on July 28, 1925, and that he never saw her afterwards. The wife's sister, Mary Teacher, who had preceded her to his country, testified that her sister and her husband came to their home in August[1] 1925, and that both went away from that house and that the wife then stayed with him about three months. She testified that when her sister came to her house "she was black and blue and she sort of spit up blood". The sister then came to her house again and remained about three months. The husband did not visit her or send her any money. Mrs. Yaich then went to

---

[1] This discrepancy as to the months in 1925 between the testimony of the husband and of the sister is of no materiality on the issue trying.

Mammoth, Pa., to keep boarders. She remained there three months. The sister visited her every week but never saw Yaich there. Mrs. Yaich then moved to Crowsnest, Pa., where she kept boarders for about eleven years. Mrs. Teacher was asked: "Did Lazo come up to see her there?" She replied: "No". She testified that Yaich never wrote his wife any letters nor sent her any clothes or money. When she was asked on cross examination as to who put those marks on her sister she answered: "Lazo". When asked how she knew she replied: "Because my sister told me." Mike Teacher, Jr., the son of Mary Teacher, and who was 14 years old in 1925, corroborated his mother as to the black and blue marks on Mrs. Yaich's person, and as to Yaich's not coming to her house and not writing any letters to her. He testified on cross examination that he heard his aunt tell his mother that he, Lazo, was going to kill her.

Anna Bukis, who resided on the one side of a double house while the Yaichs lived on the other side, testified as follows about a fight that Lazo and his wife had one night: "She [Mrs. Yaich] screaming and running this room and then this room. All night couldn't sleep." She said she asked in the morning what was wrong and Mrs. Yaich said: "Lazo hit me". She said she heard this fighting and screaming nearly every night for three months and after three months Mrs. Yaich said "she couldn't stay", and then she went away.

John Novasil testified that he boarded with Mrs. Yaich for 18 years. He was asked: "During that time did Mr. Lazo Yaich here come to that house that you know of?" He answered: "No. For eighteen years I no see him around there." There was other testimony to the same effect. George Gross testified that he knew Lazo Yaich and that during the course of a conversation with him Yaich told the witness that he had "left his wife, or put her out rather . . . due to some misunderstand-

ing, and she come back and he put her out again." This conversation was in the spring of 1944.

Dr. C. L. Mitchell, a dentist residing in Trafford, Pennsylvania, testified that Yaich told him that "he had put her out and she had come back and then he would not accept her then". Thomas B. Burkholder corroborated the testimony of Dr. Mitchell. The witness testified that he heard Yaich say: "She wanted him to sell the furniture and divide the money. He had throwed her out and she came back and he wouldn't let her in. Then he said some of his friends wanted him to go after her and he said he didn't want her any more."

Lazo Yaich testified that he sent tickets to bring his wife to this country in 1924. For fifteen years after he came to this country in 1907 he had "boarded" and then until two days after his wife arrived in 1924 he lived in a double house in Midland, Pa., with a husband and wife who were his relatives. Mr. and Mrs. Bukis lived in the other side of the house. After his wife's arrival in 1924 she lived with him eight or nine months. He said: "She leave the house the time I was working". He denied that he had ever beat his wife. When he was asked: "What made her black and blue at Midland?", he replied: "I couldn't tell you that." He admitted that after his wife left the house he never saw her and made no effort to find her. He didn't write to her sister, Mrs. Teacher, to ascertain if his wife was there. He said he told Burgess Fox in Midland that his wife had left. He added: "We never had any trouble before but after my wife left she never did like me." He denied ordering his wife out of the house and denied telling anybody that he had done so. He testified that he knew nothing of his wife's whereabouts until after she was dead. He said: "She left the house. She could come back the same way she left."

Mike Suzich testified on behalf of the respondent that he saw Lazo and his wife in Charleroi June 25,

1925, and that "they were getting along good as far as he could see". The next time he saw Mrs. Yaich she was living in Crowsnest, keeping a boarding house, and going under the name of Mrs. Kijurina. That was in 1931. He said that she and Nick Kijurina and her sister, Mrs. Teacher, visited him at his home. He said she introduced Nick Kijurina to him as her husband. He stated that he never told Lazo that his wife was "living out here by Greensburg", yet he saw him a couple hundred times. His wife and their daughter gave similar testimony.

Anna Bukis was called in rebuttal and testified that "Lazo hit that wife nearly every night he could". She was asked how she knew this and she replied: "I know she screaming, coming into the house and had black and blue." She told the witness that Lazo hit her.

In its opinion the court correctly held that it was the petitioner's burden to show that the husband constructively deserted his wife, or to show that the husband wilfully neglected or refused to provide for his wife. The court also correctly held that the desertion *by* the wife, if not justified, would relieve the husband of the obligation to support her. The Intestate Act of 1917, P. L. 429, Section 5, 20 P.S. 41, reads as follows: "No husband who shall have, for one year or upwards previous to the death of his wife, wilfully neglected or refused to provide for his wife, or shall have for that period or upwards wilfully and maliciously deserted her, shall have the right to claim any title or interest in her real or personal estate after her decease, under the provisions of this act." A desertion of a wife by a husband, without cause or consent, will be presumed to be wilful and malicious, within the meaning of the Act of 1917: *Phillips Estate*, 271 Pa. 129.

The court correctly held that the issue was whether or not the petitioner had met the burden of showing that the decedent was justified in leaving the home of her

husband. Such justification would have to be found in a cause sufficient to entitle her to obtain a divorce: *In re Nixon's Estate,* 104 Pa. Superior Ct. 506. See also *Bremer's Petition,* 279 Pa. 405. The court held that "the evidence does not meet the burden on the petitioner of showing that the testatrix had justification for leaving such as would support a divorce decree". The court also held that the wife had forfeited her right to support by her actions with Nick Kijurina if not by her desertion of her husband. The court adds: "There was not, therefore, wilful neglect or failure to provide for his wife nor a wilful and malicious desertion extending into the year immediately prior to testatrix's death."

In *Nixon's Estate,*[2] supra, the Superior Court, in an opinion by Judge KELLER, reiterated the right of an appellate court to set aside the findings of the court below "in so far as they are really inferences drawn from facts, rather than pure findings of fact, if they are not correctly reasoned or inferred". (Citing seven cases.) Inasmuch as in the instant case the findings of the court below are "really inferences drawn from facts", this court has the right to set them aside if the inferences are not warranted. We find no warrant for the inferences that the respondent's wife wilfully and without justification deserted him and thus relieved him of the legal obligation to support her. The evidence taken in its entirety convinces us that Mrs. Yaich left the home of her husband because of his ill treatment of her.

First, the facts that he left his young wife in Yugoslavia after he married her, and then for nearly 18 years after he arrived in this country he, though steadily employed in the machine shop of a steel mill, did not send for her, indicates that he did not have the feeling of

---

[2] In that case the findings were those of an auditor affirmed by the court below. The findings were affirmed by the Superior Court but the court asserted its right to set them aside if the inferences on which they were based were not correctly drawn.

affection and regard for her which husbands normally feel for their wives.

Second, the fact that a wife coming to this country from a foreign land and presumably ignorant of the American language and American ways would leave her husband's home eight or nine months after joining him in this country logically gives rise to the inference that continued existence with him had become intolerable. This inference of ill treatment is supported by the testimony of witnesses who saw black and blue marks upon her and saw her "spitting up blood" and heard her screaming when her husband was home and who were told by her that her husband had hit her.

Third, the fact that despite the circumstances that after the separation of the husband and wife they both resided in the same section of the Commonwealth, a comparatively short distance from each other, he made no effort to locate her and seek to induce her to return compels the inference that the husband did not want her back and that she had good reasons for not seeking a matrimonial sanctuary in his home but preferred to earn her own livelihood elsewhere by keeping a boarding house. When a husband and wife separate because of personal disagreements, custom and that chivalry which is properly expected of a husband requires that any initiative taken for a reconciliation is to be taken by him. Yaich gave up his home and sent the furniture to a friend 60 days after he and his wife separated and made no effort to locate his wife or to induce her to return to him.

We think that petitioner has fully met the burden of showing that there was a constructive desertion of this wife. Since there was such a desertion on his part and since he did not support her for more than one year prior to her death (in fact for 18 years after their separation in 1925) he can make no just or legal claim to any share in her estate.

The fact that in 1931, six years after his wife was forced to leave her husband she "went by the name of Mrs. Nick Kijurina" and introduced the latter as her "husband" does not entitle the respondent to a restitution of those rights in her estate which he had forfeited by his wilful and malicious desertion of her in 1925. His wife's wrongful conduct in 1931 does not nullify the legal effects of his own wrongful conduct in 1925. Since by his physical abuse of her he forced her to leave his home and support herself by her own labors outside that home, he cannot now either in law or morals successfully claim that because he can show misconduct on her part six years after his own misconduct in shattering the marriage relation he is entitled to a 50% share in the fruits of his deserted wife's labors. The husband's continued desertion and continued failure to support his wife was not due to any misconduct on her part either in 1931 or at any other time after she was forced to withdraw from his habitation, for he knew nothing about her or about her conduct after the disruption of their married life. To permit this husband, who in the eyes of the law deserted his wife in 1925, to share in an estate presumably accumulated by her labors for over 18 years in conducting a boarding house after he forced her to support herself, would conflict with the natural dictates of justice and there is no legislative mandate which requires it.

The decree of the court below is reversed and the record is remitted to that court with directions to reinstate the rule to show cause why the election of Lazo Yaich to take against the will of the decedent should not be stricken from the record and to make that rule absolute and to grant the prayer of the petition of Mary Teacher, executrix of the estate of said decedent. Costs to be paid by the estate.

Mr. Justice ALLEN M. STEARNE dissents.