Rosenberger Estate.

Argued April 14, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*William J. Grove,* with him *Alfred L. Taxis, Jr.,* and *Grove & Taxis,* for appellant.

*Julian W. Barnard,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 23, 1949:

The basic question here is which one of two women, whose "maiden names" were respectively Grace M. Raven and Marie Roger, was the common law wife of George G. Rosenberger, who died December 22, 1946, intestate and possessed of property worth about $6,000. This is an appeal by Marie Roger from the order of the court below dismissing her exceptions to the court's order.

Grace M. Raven Rosenberger claims that she is the lawful widow of the decedent and the mother of his minor child, George G. Rosenberger. If her claim is valid, *she and the minor son* are entitled to share equally in this estate. Marie Roger claims that she is the lawful widow of the decedent and denies the validity of the asserted marriage of Grace with the decedent and also denies the legitimacy of her child. If her claim is valid, *she* is entitled to the entire residue of the estate in satisfaction of the widow's exemption of $500 and the widow's allowance of $5,000 which would exhaust the entire balance for distribution.

The appellee, Grace M. Raven Rosenberger, became acquainted with the decedent near Graterford, Montgomery County, where the latter and his mother conducted a boarding house. In 1924 decedent married Florence Ziegler; this marriage ended three weeks later in a divorce. Grace's friendship with the decedent continued, apparently lawful in nature, until 1928 when she moved into the hotel which decedent operated, in order to assist in its management. After a short time he suggested that they move to a farm which he owned and that she live with him there as his wife. In February

1931 they moved to this farm and ostensibly lived there as husband and wife. The court below said: "There is ample evidence of both cohabitation and reputation sufficient to support a common law marriage." Decedent finally requested a Justice of the Peace in Norristown to marry him and Grace. He was informed that a license was required. He did not apply for one.

In April, 1931, Grace learned that she was pregnant and decedent then promised her that they would be married before the baby's birth. As the court narrates it, "The situation continued, with repeated expressions of future intentions and total lack of present action, until the last week in November, 1931, when she went to the hospital to have her baby. Decedent appeared there on the afternoon of November 28, 1931, and stated to her that they would be married before the baby was born and that he would go out and get a wedding ring. He left the hospital and returned a short time later with four or five wedding rings and asked her to take her pick. He took the one she selected, put it on her finger and said, 'Pretty soon we will have the baby. Now you have the ring, and you are my wife.' She replied, 'That is fine. I love it.' "

Shortly before Christmas of 1934 Grace discovered that decedent "was carrying on an intimate affair with another woman named Dorothy," whereupon Grace moved from the farm and returned to the home of her parents in Germantown, taking the child along with her. Thereafter Grace and decedent never resumed cohabitation. The decedent continued to manifest an affection for their child.

In the early part of 1935 decedent became interested in Marie Roger, who had just secured a divorce from her husband. Decedent proposed to her that she come and live with him on his farm as his wife. They consulted a lawyer regarding the validity of a common law mar-

riage, and in June of 1935 Marie Roger moved with him to the farm. The decedent said to Marie Roger, "This is your new home." He put his arms around her, kissed her and said, "Marie, do you take me for your husband?" and she replied, "Yes, George, I do." She then said, "Do you take me for your wife?" and he said, "Yes, I do, Marie. I love you very much." Thereafter they lived together on the farm as husband and wife, and again there is sufficient evidence both of cohabitation and reputation in respect to this couple.

In April, 1940, Grace wished to convey an interest in certain real estate which she had inherited from her mother. The decedent joined in the deed, wherein the grantors were described as "George G. Rosenberger and Grace M., his wife." Decedent acknowledged the deed before a Justice of the Peace. He continued to be interested in his son, and Grace occasionally brought the child to the farm to visit him. On one such occasion Grace and Marie met at the farm, and Grace asked who Marie was, and Marie replied, "I am Mrs. Rosenberger." Grace answered, "I happen to be Mrs. Rosenberger." She then departed with the child and never thereafter permitted the child to visit the farm although the decedent continued to call at Grace's home to see his child.

In February, 1946, Marie left the decedent. On February 14, 1946, she signed her name as Marie Roger to a paper purporting to release the decedent from all claims in consideration of the payment to her of $500. Thereafter the decedent called to see Marie at Norristown in an endeavor to persuade her to return with him to the farm. On December 20, 1946, she did return to the farm where she spent the night. The decedent suffered a stroke the same night and died the next day.

Letters of administration on his estate were granted unto Grace on December 27, 1946, by the Register of Wills of Montgomery County. On January 9, 1947,

Marie filed a petition for citation to show cause why said letters of administration should not be revoked on the ground that she, as the decedent's widow and sole heir at law, was the person lawfully entitled thereunto. Subsequently, on June 20, 1947, it was stipulated of record that the petition and citation should be withdrawn without prejudice to the rights of any party involved, leaving all questions relating to inheritance to be decided by the court at the time of audit and distribution.

The questions before the court below were whether George G. Rosenberger, 2nd, is the legitimate child of the decedent, and also whether the decedent was lawfully married at the time of his death, and if so, to whom?

"Marriage in Pennsylvania is a civil contract and does not require any particular form of solemnization before officers of church or state, but is entered into by words in the present tense, uttered with a view and for the purpose of establishing the relation of husband and wife." *Fiedler v. National Tube Company,* 161 Pa. Superior Ct. 155, 158, 53 A. 2d 821.

The court below rightly held that, "The relationship between decedent and Grace was illicit in its inception and must be presumed to have continued so until a change in the relationship was affirmatively established. Hughes Estate, 98 Pa. Superior Ct. 328, 332 (1929). The presumption of continuance of an illicit relationship can be rebutted only by proof of a valid legal marriage, that is, a marriage by mutual consent, effected by words *in praesenti,* not *in futuro.* Pierce v. Pierce, 355 Pa. 175 (1946)." The court below was correct when it reasoned as follows: "In the instant case, there is evidence that a definite change in the relationship between George and Grace took place on November 28, 1931, at the Montgomery Hospital when he placed a wedding ring on her finger, pursuant to his promise

to marry her before their baby was born, saying at that time, 'Now you have the ring and you are my wife.' Her reply, "That is fine. I love it,' certainly indicates assent on her part."

In *Caddy v. Johnstown Firemen's Relief Association*, 129 Pa. Superior Ct. 493, 498, 196 A. 590, President Judge KELLER when discussing the nature of a common law marriage said: "It is clear that when the witness said, 'he asked me if I was willing to *live that way*', she was referring to her previous answer which had been excluded by the court, 'We made the contract to live together as man and wife without a ceremony by a preacher or priest'; and so understood her answer would read, 'He asked me if I was willing to live that way—that is, to live together in the relation of man and wife without a ceremony by a preacher or priest.' To which she said, 'yes'. After which he said, in substance, 'We can live together as common law people, and she said, 'I am satisfied,' and then he took the wedding ring he had bought for the wedding ceremony and put it on her finger, and after they came out of the show and had supper, he got the car which was fixed by that time, and they drove together to the house they had furnished and started living as husband and wife. They lived together continuously as man and wife until his death. He introduced her as such to people generally; to the family doctor; to the assessor; to the lawyer who drew the sale agreement and deed for a property he owned in common with his brothers and sisters, and which she signed as his wife; to the officers of the bank where they kept a joint account as husband and wife until the bank reorganized; at the hospital where she signed the operation permit; and they were generally so recognized . . . we think the testimony of the plaintiff, instead of establishing that no marriage contract was made between them, is entirely consistent with a finding that

the parties agreed and consented then and there to become husband and wife and live together in that relation, without a marriage ceremony, and that following that agreement they cohabited together as husband and wife and were generally recognized and reputed to be such, until his death. See Sullivan v. American Bridge Co., 115 Pa. Superior Ct. 536, 176 A. 24; McGrath's Est., 319 Pa. 309, 179 A. 599."

Judge KELLER also cites with approval the following statement from Judge McKENRICK of the court below in that case: "We can conceive many varieties of declarations which might satisfy the law as to the validity of the contract. We took the position at the time of the trial, and are still of the opinion, that there was sufficient, if believed by the jury, to warrant a finding that there was a valid marriage. Nothing was left to the future; everything was intended as being in the present. The wedding ring was placed upon her finger by James H. Caddy, and we must attach some significance to that act. A wedding ring signifies that the one who presents and the one who receives are wedded. Everything that could be done was done in the course of a single transaction."

In *McCausland's Estate*, 213 Pa. 189, 62 A. 780, where the evidence was that the couple had been living together in an illicit relationship, but six weeks after the birth of their baby they "agreed with each other to become husband and wife," it was held that the relationship was thus changed into a valid common law marriage.

The court below was justified in finding that the decedent and Grace M. Rosenberger contracted a valid common law marriage. The placing of "the ring" upon her finger, after promising to marry her, was according to history and tradition a significant act. A "wedding ring" has for centuries been a symbol of marriage.

Counsel for the appellant stresses the fact that Grace did not formally "accept" the ring, but merely said, "That is fine, I love it." When in any marriage ceremony the groom places the wedding ring on the finger of his bride, the bride *does not usually* reply, "I accept this ring as proof of our marriage." The fact that she extends her hand to have the ring placed upon the appropriate finger and keeps the band there is sufficient evidence of her acceptance of it as the sign and symbol of her legal union with a man who thereby shows that he has chosen her as his wife.

When in 1935 the decedent entered into an alleged common law marriage with the appellant he was already married to Grace M. Raven, the mother of his son, and was, therefore, legally incapable of contracting another valid marriage. When he purported to marry Marie in 1935, he was committing bigamy. The marriage he had entered into four years before was still subsisting as no divorce had ever been secured. The fact that in April, 1940, he joined with Grace in the conveyance of an interest in real estate and then and there signed a deed in which he and Grace were described as "husband and wife," and the further fact that she and he thereafter appeared before a justice of the peace as husband and wife to acknowledge this deed, is strong evidence of the fact that he still recognized his 1931 common law marriage to Grace as being in full force and effect. His alleged common law marriage to Marie in 1935 was a nullity.

The court was rightfully impressed with the fact that not to recognize the decedent's marriage with Grace would be to bastardize their child. The appellee relied upon the case of *McAnany's Estate*, 91 Pa. Superior Ct. 317, where the Superior Court in an opinion by Judge CUNNINGHAM, held that the presumption and charity of the law are in favor of the legitimacy of every

child, and whoever seeks to bastardize it must establish its illegitimacy by proof that is clear, direct, satisfactory and irrefragable. In the case at bar there certainly is no such proof of the lack of marriage between decedent and Grace as to stamp George C. Rosenberger, Jr., their child, as illegitimate.

The court below held that at the time of his death the decedent was legally married to Grace and not to Marie, and, therefore, Grace was entitled to $500 widow's exemption, and the balance was to be divided one-half to her and the remaining one-half to the child.

The order of the Orphans' Court is affirmed.