Wagner Estate.

Argued January 5, 1960.   Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and Eagen, JJ.

*Samuel· B. Russell,* with him *Harold J. Ryan,* and *Ryan & Russell,* for appellant.

*Grant E. Wesner,* with him *D. Frederick Muth,* for appellees.

OPINION BY MR. JUSTICE BOK, March 22, 1960:

The basic question is whether the decedent and the claimant, once his wife, entered into a valid common law remarriage after their divorce.

Decedent died testate, leaving nothing to the claimant, who asserted marriage and filed her election to take against his will. The court below held that there had been no valid remarriage, vacated the election, and struck it from the record. The claimant has appealed.

Common law marriage has been well described by President Judge KELLER in *Baker v. Mitchell,* 143 Pa. Superior Ct. 50, 17 A. 2d 738, as a fruitful source of perjury and fraud. It is to be tolerated and not encouraged, and cohabitation and reputation do not create the marriage but rather are circumstances giving rise to a rebuttable presumption of one.

These doctrines are familiar enough. We are, however, not dealing with a first marriage but with a remarriage following divorce after twenty years of wedlock. In such case we think that the law's role of mere toleration of the common law relationship should be reversed and the status of remarriage favored, even if acquired with common law informality. If the law allows a spouse, in the generous amount of nine reasons, to establish by divorce that the marriage was a mis-

take, it should be at least equally eager to let both spouses discover that their divorce was also a mistake. We regard it better to encourage remarriage than to leave such parties under judicial edict that they were living sinfully together for ten years. If children had been born of this relationship, the wisdom of regularizing it if possible would be all the more apparent.

The court below did not disbelieve the claimant's witnesses but found the following basic facts: that the parties declared that their divorce was a mistake, that they were going to reunite, and that they were going on a second honeymoon; that they went to a motel in Eagles Mere and registered as husband and wife; and that after returning to Reading, where they had spent their married life, they cohabited there for ten years, from June, 1945, to October, 1955. The court also found that during this ten years they were known as Mr. and Mrs. Wagner by their friends.

In view of these findings it is needless unduly to labor the evidence supporting them. Appellee does not attack them but hastens to support the court's conclusion that there was insufficient evidence of reputation. While the court said that claimant did not meet her burden of proving reputation and cohabitation, the consideration of this statement must be limited to reputation because of the finding in so many words that the parties cohabited in Reading for ten years.

Thus there is a decree on the books that decedent had a meretricious relationship with his former wife, a result technically possible but unusual enough to warrant avoiding it, in the interest of the repose of morals, if reasonably feasible to do so.

Remarriage is sufficiently rare in human affairs to justify regarding it as *sui generis*. In the instant case there is evidence that the parties married in 1924, that they first separated in 1944, that the libel in divorce was filed on June 28, 1944, that final decree was signed on

November 6, 1944, and that on June 27, 1945, they went on their honeymoon to Eagles Mere. Five witnesses testified that the general reputation of the parties thereafter was that of man and wife. Examples: witness Helen Angstadt—"Q. Would you state what their general reputation was? A. Man and wife." Witness Shrank—"Q. And what was that reputation? A. . . . man and wife, Mr. and Mrs. Wagner, the same as the rest of the neighborhood. Everybody referred to them as Mr. and Mrs. Wagner. Q. And the general reputation was husband and wife? A. That's right." The court below did not reject this testimony but seems to have overlooked it when it said: ". . . Was it a consensus of opinion in the community? Did the Wagners hold themselves out as husband and wife? . . . The answers are not forthcoming and no one can obtain them from the record."

To the contrary, the answers are clear upon the record. In addition to the above quotations, Helen Angstadt testified that she heard her father introduce her mother to third parties, to "customers, tenants, friends", as his wife or Mrs. Wagner. Besides the witnesses to general reputation above mentioned, there are two who testified that the decedent introduced the claimant to them as his wife or as Mrs. Wagner.

This is ample evidence of holding out and of reputation. The court, however, felt that the claimant's reputation as Mrs. Wagner and her right to the name stemmed from the first marriage and not from the second, that some witnesses did not even know of the divorce, that the honeymoon at Eagles Mere was as consistent with sin as with virtue, and that the neighbors were not very critical of their status. All of these sound like good reasons for upholding the remarriage instead of denying it.

Generally, words in the present tense are required to prove common law marriage: *Rosenberger Estate,*

362 Pa. 153 (1949), 65 A. 2d 377; *Blecher Estate,* 381 Pa. 138 (1955), 112 A. 2d 129. But where there is no such proof available, the law permits a finding of marriage based on reputation and cohabitation when established by satisfactory proof: *Nikitka's Estate,* 346 Pa. 63 (1943), 29 A. 2d 521; *Horton Estate,* 357 Pa. 30 (1947), 52 A. 2d 895.

In the instant case the decedent is dead and the claimant's lips are sealed by the Dead Man's Act, May 23, 1887, P. L. 158, 35(e), 28 PS §322. To deny the status of marriage, let alone a remarriage, because words in the present tense cannot be proved, would be a clear injustice. It may even be said that certain acts may speak as loudly as words. In *Rosenberger Estate,* supra (362 Pa. 153), decedent bought a wedding ring and put it on his pregnant mistress's finger, saying: " ' "Pretty soon we will have the baby. Now you have the ring, and you are my wife." ' " She answered: " ' "That is fine. I love it." ' " We upheld the marriage. In *Caddy v. Johnstown Firemen's Relief Association,* 129 Pa. Superior Ct. 493 (1938), 196 A. 590, the man said: " ' "We can live together as common law people" ' ", and the woman said that she was satisfied. He then gave her a wedding ring, and President Judge KELLER quoted approvingly what the court below said of that: " 'We can conceive many varieties of declarations which might satisfy the law as to the validity of the contract. . . The wedding ring was placed upon her finger . . . and we must attach some significance to that act. A wedding ring signifies that the one who presents and the one who receives are wedded.' " In the case at bar we have no evidence of how the ring was presented and received or of what words accompanied the act, but there is evidence that it was the claimant's original wedding ring which she had laid aside at the time of divorce and resumed upon her return with the decedent from their declared honeymoon.

Appellee points to two deeds, dated in 1951 and 1957, in which the decedent appears as "single man". The fact that such a document reads in both names has been cited in several of the lower court cases, infra, as persuasive evidence of the intent to marry, but we can think of reasons suggesting the decedent's convenience in being named as single, especially in the deed of 1957, which was executed after his final separation from the claimant. Rebutting this, the evidence shows that the decedent's 1950 Federal income tax return listed the claimant as his wife and claimed an exemption for her.

In any event, no single piece of evidence is enough to establish or to destroy the conclusion of remarriage. As Mr. Justice PATTERSON well said in *Horton Estate,* supra (357 Pa. 30): "Proof of habit of the parties, expressive of and consistent with the relation of husband and wife, is a basic requirement." It would be hard to find a better show of habit than a resumption of a twenty-year marriage after an interruption of less than two years, under the circumstances of this case.

In Freedman, Law of Marriage and Divorce in Pennsylvania, Vol. 1, §56, at page 125, this appears: ". . . While the policy of the law is plainly favorable to such remarriage, the intention of the parties to marry must appear . . ."

If such intention is not shown by the circumstances alluded to above, it would be difficult to conceive of a showing of intention short of proof that *verba in praesenti* had been spoken.

There are nine Pennsylvania cases involving common law remarriage: *Blecher Estate,* supra (381 Pa. 138); *Butler Estate,* 39 Erie 120 (1956); *Commonwealth v. Fick,* 27 Berks 69 (1934); *Commonwealth v. Highland,* 55 Pa. D. & C. 553, affirmed 159 Pa. Superior Ct. 633 (1946), 49 A. 2d 529; *Commonwealth v. Serges,* 22 Luzerne 353 (1922); *Neafie's Estate,* 12

Dist. 749 (1903) (O.C., Phila.) ; *Wandall's Estate,* 29 Dist. 1132 (1920) (O.C., Wyo.) ; *Gallo v. Steinman Coal & Coke Co.,* 93 Pitts. L.J. 357 (1944) ; and *Check's Estate,* 82 Pitts. L.J. 371 (1934). Only in the two Pittsburgh cases was the status of common law remarriage denied.

Of the cases just cited, *Blecher Estate* is the only authority in this court concerning common law remarriage. In that case *verba in praesenti* were used, and there was ample evidence of cohabitation and reputation. Mr. Justice STEARNE did not discuss the policy of looking with favor upon remarriage, but we regard such policy as wise.

Appellee argues that the claimant's right to elect was barred because she and the decedent entered into an agreement on June 28, 1944, the day the libel in divorce was filed, which contained a provision that claimant gave up all rights to the decedent's property that she might acquire under the intestate laws "or otherwise howsoever." Appellee cites *Ray's Estate,* 304 Pa. 421 (1931), 156 A. 64, where there was such an agreement and a later reconciliation. We held that agreement not to be a separation contract but a post-nuptial one, based on a finding of the court below that it was in no way dependent on the continuance of the separation. One provision especially supported this conclusion: Ray agreed to and did set over a large sum of money in trust for the future support of his wife and daughter. Not only is there no such provision in the agreement before us, but the intent of the parties is spelled out to be "to enable both of [them] to deal with their real and personal property as fully and as freely and to all intent and purpose *as if each were unmarried."* (Emphasis ours.)

We feel, therefore, that *Ray* is not controlling. Here, the wording of the agreement and the reconciliation after divorce showed the original intent to have

been to make the agreement contingent upon the unmarried state and to abandon it when that state was abandoned. See *Henkel's Estate*, 59 Pa. Superior Ct. 633 (1915); *Zlotziver v. Zlotziver*, 355 Pa. 299 (1946), 49 A. 2d 779; *Commonwealth ex rel. Makowski v. Makowski*, 163 Pa. Superior Ct. 441 (1948), 62 A. 2d 71; *Commonwealth ex rel. DiValerio v. DiValerio*, 169 Pa. Superior Ct. 477 (1951), 82 A. 2d 687. On all factual fours is the case of *Seuss v. Schukat*, 358 Ill. 27 (1934), 192 N.E. 668, cited approvingly in *Hoeffner v. Hoeffner*, 389 Ill. 253 (1945), 59 N.E. 2d 684. The *Seuss* case involved a property settlement entered into before the first marriage; then followed divorce and remarriage of the parties to each other. The Illinois Supreme Court held that the agreement did not bar the husband's rights under the remarriage.

Appellee finally argues that the claimant forfeited her right to elect because she left the decedent, citing Section 9 of the Wills Act of 1947, P.L. 89; 20 PS 180.9, which provides: "A wife, who for one year or upwards previous to the death of her husband shall have wilfully and maliciously deserted him, shall have no right of election."

It is true that the claimant left the decedent for the second and last time in 1955 and that he died in 1958. Claimant testified that during the year before she left him he struck her with his fist about six times, failed to care for her when she was ill, twice threw a plate of food at her, blacked her eye, called her stupid, a fool, and a bitch, humiliated her in front of others, and was getting worse toward the end of the period; also that her health was worsening rapidly. She was corroborated by her daughter and son-in-law. It also appears that he had begun to see another woman, his sister-in-law, and that his car was outside her home once a week. From all of this testimony, which was not dealt with by the court below in its opinions but which

we think was competent, we regard her withdrawal from their common domicile as justified and neither wilful nor malicious: *Jac Estate*, 355 Pa. 137 (1946), 49 A. 2d 360.

The appellant has also appealed from the refusal of the court below to review its decree and admit certain correspondence in the nature of after-discovered but cumulative evidence. This is only another assignment of error which, in view of our disposition of the case, need not be considered.

The decree of the court below is reversed and the election of Madeline H. Wagner to take against the will of her husband, Charles I. Wagner, is ordered to be reinstated: costs to be paid by the estate.