Manfredi Estate.

Argued October 7, 1959.  Before JONES, C.J., BELL, JONES, COHEN, BOK and McBRIDE, JJ.

*John F. Roney,* for appellant.

*Sherman H. Siegel,* with him, *J. R. Irwin Knox,* for appellee.

OPINION BY MR. JUSTICE BELL, April 18, 1960:

Frank Manfredi, of Washington, Pa., died on February 12, 1955, intestate and unmarried. The Orphans' Court found that a sister of the decedent was entitled to decedent's estate. The Court also found that an alleged nephew, Fiore Manfredi—who claimed that he was born in San Mango D'Aquino, Italy, October 26, 1909 and that he was the son of *Fedele* Manfredi and Teresa Mendicino, who were eventually married on April 30, 1916 in San Mango D'Aquino—was not a legitimate child of decedent's brother *Fedele,* and consequently was not entitled to a share of the decedent's estate. This claimant took no appeal. The Court likewise found that Mary Maola, the appellant, was not the legitimate child of decedent's brother, *Fedele* Manfredi, and consequently was not entitled to a share of the decedent's estate.

The Manfredis were poor Italian people who from 1907 until 1912 lived in a shanty in Washington, Pa. The shanty, which consisted of 2 or 3 rooms, was owned by decedent and was occupied (1) by the decedent, and (2) by his brother, *Fedele* Manfredi, and (3) by Joe Gallo, and (4) by Mary Yanni, and (5) *in 1912 for 4 or 5 months* by Mary Maola's mother, Catherine Fiorelli.

Appellant's proof that she was the legitimate daughter of decedent's brother, Fedele, may be thus summarized:

(a)  Mary's own testimony that her mother told her that *Fedele* was her father. She never knew her father, because he left her mother and herself when she was about six months old to return to Italy in 1913

because of an alleged illness. Fedelé died in Italy on August 26, 1916.

(b) Mrs. Grace Mary Papa testified that she moved to *Smith's Ferry* in 1912; that Fedele and his wife were already there; that he referred to Catherine as his wife; and that the Italian families in Smith's Ferry, numbering 5 or 6, "all took it that they were husband and wife". About four months after Fedele left for Italy, his brother Frank came and said Fedele told him to remove all the furniture, which he did. Catherine then moved into the apartment with Mrs. Papa, where she remained for four or five months.

(c) Louis Yanni testified that he knew Fedele and Catherine; that Fedele sent to Italy for Catherine; that he visited their home in Smith's Ferry; that they referred to Mary as their "baby"; and that several Italian people in Smith's Ferry knew them as man and wife. The auditing Judge, who saw and heard the witnesses, stated that he was a confusing witness.

(d) Frank Ricitelli testified that he worked with Fedele in 1911 in *East Liverpool, Ohio,* and that he lived practically next door to him in that town; *that Fedele and Catherine lived together there,* and he and the neighbors thought they were man and wife. This testimony of cohabitation and reputation in East Liverpool, Ohio, was contradicted by every other one of appellant's witnesses.

(e) Antonio Yanni testified that he saw Fedele in Smith's Ferry in 1913; that Fedele said he had a wife and kid at home; and that after May, 1913, Fedele was sick and returned to Italy. He further testified that he never heard anybody discuss the reputation of Fedele and Catherine as to whether or not they were married.

(f) Appellant also called Anthony Comfort, administrator of Frank's estate, as on cross-examination.

He testified that he saw decedent every day for many years and he never heard him mention his niece, Mary Maola. He further testified that he first met Catherine in Washington, Pa., about 1912; that Joe Gallo had sent for her; and that when she arrived she moved into the shanty which was occupied by Joe Gallo, Frank Manfredi, Fedele Manfredi and Mary Yanni. Catherine remained there for four or five months and left in a pregnant condition.

Appellee proved by Anthony Comfort's cousin, James Comfort, that the latter knew Joe Gallo and Frank Manfredi for the 50-year period during which he lived in Washington, Pa.; that Gallo told him he had sent to Italy for Catherine; and that when Catherine arrived in this country she went to live in decedent's shack in Washington, Pa., with Joe Gallo, Frank Manfredi, Fedele Manfredi and Mary Yanni.

Appellee offered in evidence a certified copy of the marriage application of appellant's mother Catherine to John Leon, dated *February 10, 1914,* which was approximately 7 months after Fedele returned to Italy. In this application, which was signed by Catherine by a mark, in response to the question as to whether there was a prior marriage, the answer was "none". The application also showed that Catherine applied for this marriage license *in her maiden name,* Catherine Fiorelli, instead of in the name of Catherine Manfredi, which would have been her legal name if she were married to Fedele. Appellee also offered in evidence a certificate certified to by J. J. Kirby, a Justice of the Peace, that Catherine Fiorelli and John Leon were married by him on February 10, 1914. The record also shows that Catherine and John Leon's first child, Frank Leon, was born on May 2, 1915, and that they had two more children. The auditing Judge correctly admitted these documents—in fact there was no objection thereto.

For reasons of public policy it has been the law for centuries that there is a tremendously strong presumption that children who are born in wedlock are legitimate: *Cairgle v. American R. and S. S. Corp.*, 366 Pa. 249, 77 A. 2d 439, and cases cited therein. In that case the Court said (pages 256-257): " 'A child born or begotten in wedlock is presumed to be legitimate, and neither the mother nor her husband can bastardize it by testifying to non-access.'

"[Nevertheless] a wife is competent to prove the fact and time of her marriage, the date and place of birth of her child, the name she gave the child, the fact of access, her separation from her husband, her own adultery, where she and the child have lived, who supported the child, and any other independent facts affecting the question of legitimacy, even though some of those facts may result in establishing illegitimacy: Janes's Estate, 147 Pa. 527, 530, 23 A. 892; Dennison v. Page, 29 Pa. 420, 423, 424, 425; Commonwealth v. Shepherd, 6 Binney 283; Commonwealth v. Gantz, 128 Pa. Superior Ct. 97, 193 A. 72; Commonwealth v. Atherton, 129 Pa. Superior Ct. 64, 194 A. 779; Commonwealth v. Barone, 164 Pa. Superior Ct. 73, 63 A. 2d 132; Commonwealth v. DiMatteo, 124 Pa. Superior Ct. 277, 188 A. 425."

One of the difficulties with Mary Maola's claim is that if Catherine had entered into a common law marriage with Fedele as soon as she arrived at the shanty to marry Joe Gallo or Fedele, and was pregnant 4 or 5 months later, Frank Leon, the first child born of the ceremonial marriage of Catherine and Leon on May 2, 1915, would be illegitimate, as would every other child of this marriage who was born before the impediment, i.e., the death or divorce of Fedele, was removed. Appellee further proved that appellant in public schools and in her application for marriage used the surname Leon and not the name Manfredi.

If Catherine and Fedele lived together in East Liverpool, as one of appellant's witnesses testified, their relationship from the beginning was meretricious, and appellant failed to prove any change in their relationship. Appellant's testimony as to cohabitation eight months or less in Smith's Ferry, and proof of reputation among a few Italian families, was undoubtedly very weak. The subsequent conduct of the alleged contracting parties refutes this weak proof of a common law marriage. Fedele admittedly left his alleged wife and child, appellant, 6 months after the child was born and returned to Italy. Approximately 7 months after Fedele left, Catherine entered into a formal ceremonial marriage with John Leon while Fedele was yet alive, in which she stated that she had never been married, and was married under her maiden name. When Fedele's brother Frank, the decedent, came 3 or 4 months after Fedele left for Italy to the house at Smith's Ferry, where Catherine and appellant were living, and took away all the furniture under the direction of his brother (except a high chair for the baby and a sewing machine) no objection was made by Catherine. Moreover, Catherine living in a two or three room shanty with Gallo and Fedele, and the conflicting evidence as to which one of the two men had sent for her, as well as the short period of time of 8 months in which Fedele alone allegedly cohabited with her in Smith's Ferry, make it extremely doubtful whether any Court would be justified in finding a common law marriage, especially where, as here, it would bastardize one or more children of Catherine and John Leon, who were ceremonially married on February 10, 1914.

The trial Judge correctly decided that Catherine's application for marriage and her ceremonial marriage to John Leon in 1914, *when considered with all the other evidence in the case,* "particularly the weakness of evidence of reputation and cohabitation as husband and

wife, and short period of cohabitation shown by it; the fact that their original relations were meretricious; her permitting (without opposition) decedent to take away their furniture after Fedele left, . .." established that she was not the legitimate child of Fedele Manfredi and was therefore not entitled to a share of Frank Manfredi's (her alleged uncle) estate.

Marriage in Pennsylvania is a civil contract by which a man and a woman take each other for husband and wife. There are two kinds of marriage: (1) ceremonial; and (2) common law. A ceremonial marriage is a wedding or marriage performed by a religious or civil authority with the usual or customary ceremony or formalities. It is too often forgotten that a common law marriage is a marriage by the express agreement of the parties without ceremony, and almost invariably without a witness, *by words*—not in futuro or in postea, but—*in praesenti*, uttered with a view and for the purpose of establishing the relationship of husband and wife: *Fiedler v. National Tube Company*, 161 Pa. Superior Ct. 155, 158, 53 A. 2d 821; *Rosenberger Estate*, 362 Pa. 153, 65 A. 2d 377; *Craig's Estate*, 273 Pa. 530, 117 A. 221; *Commonwealth v. Stump*, 53 Pa. 132; *McGrath's Estate*, 319 Pa. 309, 179 A. 599.

Because it is often difficult to prove a common law marriage by words in praesenti, the law has created or raised a rebuttable presumption of marriage where two absolutely essential elements are conjoined and co-exist—constant, as distinguished from an irregular or inconstant, cohabitation plus a reputation of marriage, which is not partial or divided but is broad and general. Constant cohabitation, even when conjoined with general reputation are not marriage, they are merely circumstances which give rise to a rebuttable presumption of marriage: *Nikitka's Estate*, 346 Pa. 63, 29 A. 2d 521; *Hilton's Estate*, 263 Pa. 16, 106 A. 69; *Patterson's Estate*, 237 Pa. 24, 28, 85 A. 75; *Yardley's*

*Estate,* 75 Pa. 207; *Appeal of Reading Fire Ins. & Trust Co.,* 113 Pa. 204, 6 A. 60; *Callery's Estate,* 226 Pa. 469, 75 A. 672; *Craig's Estate,* 273 Pa. 530, 117 A. 221; *Levy's Estate,* 307 Pa. 522, 161 A. 740; *Bicking's Appeal,* 2 Brewster 202.

". . . 'The mere fact that they [the alleged contracting parties] were known to a few people as man and wife is not sufficient evidence to establish marriage. Proof of reputation for such purpose must be general and not confined to a few persons in the immediate neighborhood, as the relationship may be established merely for the purpose of deceiving others:' Hilton's Estate, 263 Pa. 16, 19. See also Yardley's Estate, 75 Pa. 207, 212; Appeal of Reading Fire Ins. & Trust Co., supra, 207. . . .

". . . The law, of necessity, imposes a heavy burden on one who grounds his claim on an allegation of common-law marriage. As said by President Judge KELLER in Baker v. Mitchell, 143 Pa. Superior Ct. 50, 54: 'The law of Pennsylvania recognizes common-law marriages. But they are a fruitful source of perjury and fraud, and, in consequence, they are to be tolerated, not encouraged; the professed contract should be examined with great scrutiny, and it should plainly appear that there was an actual agreement entered into, then and there, to form the legal relation of husband and wife.' Especially is this true where one of the parties is dead and the claim so grounded is to share in the distribution of his estate. 'When the lips of a man are sealed by death, and he leaves no satisfactory evidence as to the existence of such contract, courts will be very slow to establish it in derogation of the undoubted rights of those who follow him': Stevenson's Estate, supra, 301. See also Craig's Estate, supra, 538; Osterlings Estate, 323 Pa. 23, 27; McGrath's Estate, supra, 318": *Nikitka's Estate,* 346 Pa. 63, 66-67, 29 A. 2d 521.

Fiore Manfredi, another claimant, attempted to prove, as we have seen, that he was the lawful son of Fedele by a prior common law marriage in 1907, which was followed by a ceremonial marriage in 1916. If Fiore was legitimate, then Mary Maola was illegitimate. Moreover, if Mary Maola is legitimate by a common law marriage in 1912, then Frank Leon, who was born on May 2, 1915, and who was the son of Catherine and John Leon who were ceremonially married on February 10, 1914, would be bastardized, and all the other children of this lawful Leon marriage who were or could have been born before the death or divorce of Fedele would be bastardized.

*Kerwin Estate,* 371 Pa. 147, 89 A. 2d 332, which is relied upon by appellant, is not only sui generis, but its facts make it, as the Court below said, distinguishable. The presumption of legitimacy was never intended to apply where it would result in bastardizing other issue.

We approve the findings and conclusions of the lower Court that Mary Maola is not a legitimate child of Fedele Manfredi and therefore is not entitled to a share in distribution of the estate of her alleged uncle, Frank Manfredi.

Decree affirmed; each party to pay their respective costs.