J-S74001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF VERNELL SMITH, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: WILLIAM SMITH AND JAMES SMITH | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 527 EDA 2018 |

Appeal from the Order Entered January 19, 2018
In the Court of Common Pleas of Philadelphia County Orphans' Court at
No(s):  5 DE of 2017

BEFORE:  LAZARUS, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, J.:                **FILED FEBRUARY 06, 2019**

William Smith and James Smith ("Appellants") appeal from the order, entered in the Court of Common Pleas of Philadelphia, Orphans' Court Division, denying their appeal from the order of the Register of Wills that granted Letters of Administration d.b.n. on the Estate of Vernell Smith, Deceased ("Decedent"), to Appellee, Arthur Sanders, after finding that Sanders and the Decedent had entered into a valid common-law marriage.  Upon careful review, we reverse.

Decedent died intestate on January 7, 2016.  She was survived by her three sons, Appellants and Eric Smith.  On November 18, 2016, Letters of Administration were granted to William Smith.  Subsequently, on June 23, 2017, the Register of Wills revoked the letters issued to William and issued Letters of Administration d.b.n. to Sanders as Decedent's common-law

J-S74001-18

husband. On July 14, 2017, Appellants filed an appeal from the decree of the Register in the Orphans' Court Division.

The Orphans' Court held a hearing on January 16, 2018, at which time it heard testimony from Sanders and various family members of Sanders and the Decedent. By order issued that same date, the court denied the appeal, concluding the evidence demonstrated that Sanders and the Decedent entered into a valid common-law marriage in or before 1982. This timely appeal followed, in which Appellants raise the following issues for our review:

> 1. Was the evidence at trial sufficient to establish a common[-]law marriage?
>
> 2. Did the [Orphans' Court] misapply the law of [c]ommon[-]law marriage requiring an exchange of *verba in praesenti*?

Brief of Appellants, at v.

We begin by noting our standard of review, which requires this Court to be "deferential" to an Orphans' Court's findings. *In re Fielder*, 132 A.3d 1010, 1018 (Pa. Super. 2016). We must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. *Id.* Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of discretion. *Id.* The court's decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law. *Id.*

In *Staudenmayer v. Staudenmayer*, 714 A.2d 1016 (Pa. 1998), our Supreme Court addressed the doctrine of common-law marriage.

- 2 -

Marriage in Pennsylvania is a civil contract by which a man and a woman take each other for husband and wife. ***In re Estate of Manfredi***, [] 159 A.2d 697, 700 ([Pa.] 1960). There are two kinds of marriage: (1) ceremonial; and (2) common law. ***Id.*** A ceremonial marriage is a wedding or marriage performed by a religious or civil authority with the usual or customary ceremony or formalities. ***Id. See*** 23 Pa.C.S. § 1501, *et seq*.

Because claims for the existence of a marriage in the absence of a certified ceremonial marriage present a "fruitful source of perjury and fraud," Pennsylvania courts have long viewed such claims with hostility. ***See In re Estate of Wagner***, [] 159 A.2d 495, 497 ([Pa]. 1960). Common law marriages are tolerated, but not encouraged.[1] ***Id.***

***Id.*** at 1019–20.

A common-law marriage can only be created by an exchange of words in the present tense—"*verba in praesenti*"—spoken with the specific purpose of creating the legal relationship of husband and wife. ***Commonwealth v. Gorby***, 588 A.2d 902, 907 (Pa. 1991); ***see also Estate of Manfredi***, 159 A.2d 697, 700 (Pa. 1960). "The requirement of 'words in the present tense' is designed to ensure the existence of a present intent to marry, like the present intent established in a formal wedding ceremony, rather than a plan to marry in the future or a claim to have wed in the past." ***In re Estate of Carter***, 159 A.3d 970, 979 (Pa. Super. 2017). The common-law marriage contract does not require any specific form of words; all that is essential is

---

[1] In 2004, our legislature amended section 1103 of the Domestic Relations Code to prospectively abolish common-law marriage effective January 1, 2005. However, the act provided that "[n]othing in this part shall be deemed or taken to render any common-law marriage otherwise lawful and contracted on or before January 1, 2005, invalid." 23 Pa.C.S.A. § 1103.

proof of an agreement to enter into the legal relationship of marriage at the present time. **Estate of Gavula**, 417 A.2d 168, 171 (Pa. 1980).

Where testimony regarding *verba in praesenti* is available, the party claiming a common-law marriage must produce clear and convincing evidence of the exchange of words in the present tense, spoken with the purpose of establishing the relationship of husband and wife. **Staudenmayer**, 714 A.2d at 1021. The burden of proof has been described by our Supreme Court as a "heavy" one, to be viewed with "great scrutiny." **Estate of Carter**, 159 A.3d at 979.

In cases where testimony regarding the exchange of *verba in praesenti* is unavailable, such as where one party to the marriage is deceased and the decedent's estate asserts the Dead Man's Act,[2] our Supreme Court has

---

[2] The Dead Man's Act provides, in relevant part, as follows:

> [I]n any civil action or proceeding, where any party to a thing or contract in action is dead . . . and his right thereto or therein has passed, either by his own act or by the act of the law, to a party on the record who represents his interest in the subject in controversy, neither any surviving or remaining party to such thing or contract, nor any other person whose interest shall be adverse to the said right of such deceased or lunatic party, shall be a competent witness to any matter occurring before the death of said party . . . , unless the issue or inquiry be *devisavit vel non*, or be any other issue or inquiry respecting the property of a deceased owner, and the controversy is between parties respectively claiming such property by devolution on the death of such owner, in which case all persons shall be fully competent witnesses.

established a rebuttable presumption of marriage, which arises where the party claiming a common-law marriage proves: (1) constant cohabitation; and (2) a reputation of marriage "which is not partial or divided but is broad and general." ***Staudenmeyer***, 714 A.2d at 1020–21. This presumption is to be applied only in cases where other proof is not available. ***In re Nikitka's Estate***, 29 A.2d 521, 522 (Pa. 1943). ***See also Pierce v. Pierce***, 49 A.2d 346, 348 (Pa. 1946) ("Where a common[-]law marriage is asserted, any presumption which might otherwise be indulged in, becomes immaterial when the one asserting the validity of the relationship relies upon a putative contract which is legally insufficient to establish the fact of marriage.").

The Orphans' Court summarized the evidence presented in this case as follows:

---

42 Pa.C.S.A. § 5930. The purpose of the Act is "to prevent the injustice that would result from permitting a surviving party to a transaction to testify favorably to himself and adversely to the interest of a decedent, when the decedent's representative would be hampered in attempting to refute the testimony or be in no position to refute it, by reason of the decedent's death." ***In re Estate of Hall***, 535 A.2d 47, 53 (Pa. 1987).

A common-law marriage is a civil contract, ***McGrath's Estate***, 179 A. 599, 602 (Pa. 1935), and therefore the surviving partner to an alleged common law marriage would really be testifying to a contractual relationship between himself and the decedent. ***In re Estate of Stauffer***, 476 A.2d 354, 357 (Pa. 1984). Such testimony is clearly proscribed under the Dead Man's Act. ***Id.***

Nevertheless, the protection under the Dead Man's Act may be waived. ***Olson v. N. Am. Indus. Supply, Inc.***, 658 A.2d 358, 364–65 (Pa. Super. 1995). That is the case here, as neither party raised the Dead Man's Act as an impediment to Sanders' testimony.

Arthur Sanders testified that he faithfully lived with [Decedent] as her husband from 1981 or 1982 until her death [in 2016]. Mr. Sanders testified that they agreed to be married when they moved in together and that they held themselves out as husband and wife. Mr. Sanders testified that on plenty of occasions [Decedent] received mail as Vernell Sanders. Mr. Sanders gave [Decedent] a ring to symbolize their marriage and brought it with him to court. Ms. Smith's sons James and Eric lived with them but William never did. Mr. Sanders testified that he treated [Decedent's] children as his own and that James and Eric called him ["P]op.["] He added that he is the grandfather to their children and they call him ["P]op-[P]op.["] He still has a relationship with his grandchildren they exchange cards and gifts to this day. [Decedent's] [m]other's [o]bituary list[ed] Arthur Sanders as [Decedent's] "life-mate." Mr. Sanders was a pallbearer at said funeral and considered her his mother-in-law. Mr. Sanders is listed as the 100% beneficiary of [Decedent's] life insurance policy. When [Decedent] died, Mr. Sanders made all of the funeral arrangements and paid all of the expenses.

. . . [Donna Samuel, cousin of Decedent,] testified that Mr. Sanders was [Decedent's] husband and that [Decedent] told her that Mr. Sanders was the person she intended to be with for the rest of her life. She also stated that [Decedent's] children called him ["P]ops["], they considered each other's grandchildren as their own and that Mr. Sanders was present at all family gatherings over the years. Tyron Russell[, Decedent's cousin,] testified that their family always considered them a married couple. He added that they lived together continuously for decades as husband and wife and that they shared a bedroom with one bed. [Russell] also testified that [Decedent's] children called Mr. Sanders ["P]ops.["] Sharon Sanders[, Sanders' sister,] testified that they lived together as husband and wife and that [she and Decedent] called each other ["]sister-in-law.["] She added that her children called [Decedent] ["]Aunt Bonnie.["] She also corroborated that [Decedent's] children called Mr. Sanders ["P]ops.["] . . .

[Sanders] also submitted a trial deposition of [Decedent's son] Eric Smith. Eric Smith testified that he knows Arthur Sanders as his pop and that he always knew him as the husband of his mother. He stated that his brothers, William and James, called him ["P]op["] also. He added that Mr. Sanders lived with them since he was about six years old and they lived as a family.

Orphans' Court Opinion, 5/21/18, at 1-3 (citations to record omitted).

On appeal, Appellants argue that Sanders, having been present to testify and thus ineligible to assert the rebuttable presumption of marriage, *see Nikitka's Estate*, *supra*, did not meet his heavy burden of establishing an exchange of *verba in praesenti*, spoken with the specific purpose that the legal relationship of husband and wife be created thereby. Rather, Appellants assert that Sanders merely "discussed" marriage with the Decedent at the time he began cohabiting with her in 1982. Appellants also cite Sanders' inconsistent and vague testimony regarding the time and place of the exchange of *verba in praesenti* and assert that the Orphans' Court applied the law incorrectly. Finally, Appellants argue that Sanders presented no objective *indicia* of marriage, such as a change of name, jointly owned accounts, or joint tax filings.

At trial, Sanders testified as follows on cross-examination:

Q:  Did there come a time when you discussed marriage?

A:  Yes.

Q:  When was that?

A:  When I moved in with her, we discussed getting married.

Q:  And that was, that was back in '74?

A:  '82.

Q:  '82, that you moved in, okay. What was discussed?

A:  Discussed that I was coming into this house as her soulmate, as her lifetime partner and that we were going to live together as husband and wife until we got married.

Q: . . . And would you agree that you don't recall where that conversation took place?

A: It took place at the house, in the house.

Q: Do you recall being asked—do you recall giving a deposition in this matter?

A: Yes.

. . .

Q: On page 24 [of the deposition transcript], I'm going to read the question before it too, but it is beginning with line four:

"[QUESTION:] Was there only one conversation where that took place or was that more than one conversation?

ANSWER: I believe it was one.

QUESTION: Where did the conversation take place?

ANSWER: I don't recall where we was at."

Do you recall giving that testimony?

A: No.

Q: Is it fair to say you don't remember the time of year that conversation took place?

A: I don't remember the time of year, no.

*Id.* at 7-9 (emphasis added).

Later, on direct examination, Sanders testified as follows:

Q: And when did you marry [Decedent]? If you had to give the Judge a year you became husband and wife, we understand there was no formal ceremony, what year?

A; Around '81, '82. Like when I was away, I think might have did it when she came to visit me, when I was going to live with her as her husband.

*Id.* at 95.

Sanders argues that he presented clear, convincing and unrebutted evidence of his marriage to the Decedent, claiming that the following exchange constituted *verba in praesenti* sufficient to establish a common-law marriage:

Q: '82 that you moved in, ok. What was discussed?

A: Discussed that I was coming into this house as her soulmate, as her lifetime partner and that we were going to live together as husband and wife until we got married.

Q: All right. And would you agree that you don't recall where that conversation took place?

A: It took place at the house, in the house.

*Id.* at 7. Sanders asserts that this testimony, combined with the testimony of family members as to the couple's cohabitation and reputation of marriage, was sufficient to meet his burden of proving marriage by clear and convincing evidence. We are constrained to disagree.

The testimony upon which Sanders relies to establish *verba in praesenti* falls far short of the clear and convincing standard and, in fact, tends to establish the opposite of what Sanders seeks to prove. The words demonstrate that the couple intended to live as husband and wife until such time as they entered into a contract of marriage at some time in the future. *See id.* While no specific form of words is required to enter into a common law marriage contract, the words uttered must evidence an intent to establish the legal relationship of marriage, not in the future or in the past, but at the present time. *See Staudenmeyer*, 714 A.2d at 1020. The words testified

to by Sanders merely evidence the couple's intent to marry at some point <u>in the future</u>. As such, the evidence was insufficient to establish a common-law marriage under the well-established precedent of our courts.

Moreover, in relying almost exclusively on evidence of cohabitation and reputation to find a marriage, the Orphans' Court misapplied the law. The rebuttable presumption allowing a proponent to rely on such evidence does not pertain where testimony is available regarding the formation of a marriage contract through *verba in praesenti*. **Nikitka's Estate**, **supra**. Because Sanders testified at trial, the rebuttable presumption is inapplicable and Sanders' claim to a common-law marriage must rise or fall on his evidence as to the exchange of words in the present tense. **Staudenmeyer**, 714 A.2d at 1021 ("[W]here the parties are available to testify regarding *verba in praesenti*, the burden rests with the party claiming a common[-]law marriage to produce clear and convincing evidence of the exchange of words in the present tense spoken with the purpose of establishing the relationship of husband and wife[.]"). Because Sanders did not meet this heavy burden, the Orphans' Court erred in finding that a common-law marriage existed between Sanders and the Decedent.

Order reversed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/6/19