## Sinclair v. Sinclair

476

*Louis C. Glasso*, for plaintiff.

*Wolken & Landy*, for defendant.

VAN DER VOORT, J., February 7, 1961.—This is a contested action in divorce from bed and board on the grounds of indignities to the person.

The case was tried before the late Thomas M. Marshall, judge of this court who died prior to handing down his decision, and is now here to be decided upon the present state of the record by stipulation of counsel for both parties.

The parties were never formally married by an officer of a church or of the State, and plaintiff bases her action on a common-law marriage. While defendant denied conduct amounting to indignities, his defense consisted of a denial of any common-law marriage to plaintiff.

The question before the court is whether or not a valid common-law marriage was contracted between these parties.

### Facts

The parties first became acquainted in 1951 while plaintiff was attending Chatham College. They saw each other regularly for about a year and a half, after which time they ceased keeping company, and did not encounter each other again for several years. During this interval, plaintiff married another man by the

name of Richard Pratt. There was a child born of this marriage, which was severed by divorce in February of 1957.

About three weeks prior to the time her divorce decree was filed, plaintiff and defendant renewed their friendship and once again began keeping regular company. This friendship, innocent at its commencement, subsequently changed into a meretricious relationship.

Plaintiff became pregnant by defendant in June of 1957, and by the procurement of defendant, had an abortion performed through the services of unnamed persons. She hemorrhaged as a result of the abortion and had to be hospitalized in August of 1957. During this hospital confinement, plaintiff claims that the marriage contract was made by the exchange of marriage vows between them. Defendant paid all the medical and hospital expenses in connection with this illness.

Following her recovery, the parties did not set up housekeeping. Plaintiff returned to work at her employment, and defendant continued to live at the home of his parents.

Later in that same year, plaintiff again became pregnant by defendant. This time, they leased an apartment in Johnstown, Pa., about an hour's drive from Pittsburgh, where plaintiff went to live during her pregnancy. Defendant visited her periodically, mostly on week ends, and he paid the expenses of maintaining her in this apartment. They were known as man and wife to a limited circle of acquaintances.

Plaintiff delivered a male child on August 14, 1958, at the Mercy Hospital in Johnstown. Defendant admitted his paternity of this child, and signed the admission papers which listed plaintiff as his wife, and paid all the medical and hospital expenses in connection with this maternity. Following her release from the hospital, defendant used 10 days of his vacation time

to stay with plaintiff and their child, and assist her in and about the apartment.

After the birth of their child, plaintiff began to urge defendant to enter into a civil marriage ceremony. This defendant refused to do, saying that his family objected. Plaintiff talked to defendant's mother about persuading her son to marry plaintiff; she took defendant with her to a minister, Dr. Shoemaker, in an effort to have Dr. Shoemaker persuade defendant to marry her. She talked to defendant's father about it, but defendant would not marry her. Finally, defendant broke off relations with plaintiff and left her to shift for herself.

### Discussion

A common-law marriage, which is one effected by agreement of the parties without the formality of a church ceremony or officiating officer, and without a license, is valid: Craig's Estate, 273 Pa. 531; Buradus v. General Cement Products Co., 356 Pa. 349, affirming 159 Pa. Superior Ct. 501. Such a marriage does not require any particular form of solemnization before officers of a church or the State so long as there is consent freely given by persons competent to contract: Blecher Estate, 381 Pa. 138; Craig's Estate, supra. Such a marriage must be evidenced by words in the present tense, uttered with a view of establishing at that time the relationship of husband and wife: Blecher Estate, supra.

While the law of Pennsylvania recognizes common-law marriages, they are deemed to be a fruitful source of perjury and fraud, and, in consequence, they are tolerated and not encouraged. The professed contract is examined with great scrutiny to see if it plainly appears that there was an actual agreement entered into then and there, to form the legal relationship of man and wife: Stevenson's Estate, 272 Pa. 291.

In the case at bar, the proof of the common-law marriage rests on the assertion of it by plaintiff and a denial of it by defendant. Where proof rests upon contradicted testimony, special attention must be given to the circumstances under which it is claimed that the marriage contract was made. Plaintiff claims that she and defendant exchanged marriage vows on a Sunday, August 18, 1959, in a public ward in the McKeesport Hospital.

The evidence is conflicting as to the circumstances of this exchange and the part played by defendant. The first difference centers around plaintiff's first pregnancy and her abortion. She testified that defendant was the man responsible, and that he insisted upon an abortion rather than to marry her; he made all the necessary arrangements for the abortion. Defendant claims that he was not responsible for this pregnancy, that he refused to marry her, and he admits his part in arranging for the abortion; he stated that he did so as a "big brother."

The next point of difference concerns the professed marital contract. Plaintiff's exact testimony reads as follows:

"Q. Pick up the story where you left it off.

"A. He asked me if I would want to go through a common-law marriage, and I didn't know what he was talking about. He said he had gone to see some lawyer, and that lawyer said all we had to do was exchange marriage vows and in our eyes we would be married.

"Q. Did he give you any reason why he wouldn't enter into a religious or civil ceremony?

"A. His family.

"Q. What do you mean by his family?

"A. He knew they would object because I was Catholic and I was divorced and he asked me to wait until he could approach them better.

"Q. What did you say when he proposed this common-law marriage?

"A. I agreed to it.

"Q. Did you believe in his sincerity?

"A. Yes.

"Q. Do you remember what he said you had to go through to perform this ceremony?

"A. Just to say, 'I take you for my husband.'

"Q. Did you two take vows such as you said?

"A. Yes, we did.

"Q. Did you believe he was sincere?

"A. I did, because he seemed very serious and extremely sober about the whole thing.

"Q. Were you serious about it?

"A. Yes.

"Q. Did you intend that to be a valid marriage?

"A. Yes. I felt we were married."

According to plaintiff, defendant was sorry for her trouble and wanted to make up for his part by marrying her. It should be noted that plaintiff did not testify that defendant said, "I take you for my wife," or any equivalent words.

Defendant denied that such words were spoken between them. He stated that the subject of marriage was not even discussed during that visit, which lasted about 20 minutes and took place in a public ward of the McKeesport Hospital where there were approximately 15 other hospital beds.

If words of marriage were spoken, it is obvious that plaintiff herself, much less defendant, did not regard them as creating a contract of marriage. The subsequent conduct of the parties becomes important on this point. They made no announcement of any marriage; there was no cohabitation or reputation of marriage

between them as those terms are used in the law. They lived separately as unmarried persons following her release from the hospital. She returned to work at her place of employment, and he continued to live with his parents. He did not have her named beneficiary on any insurance policies. He did not claim her as an exemption for income tax purposes, nor designate her as his wife on his employment records. He never introduced her as his wife to his family or friends, nor is there any evidence that others considered them married.

They continued to live separately and apart as single persons until they discovered that she was pregnant for the second time, when they leased the apartment as man and wife. This Johnstown apartment episode does not add any strength to plaintiff's case. She testified that this was a temporary arrangement in furtherance of the marriage, to last only until defendant found it suitable to announce their marriage, and to remarry her publicly. Defendant testified, in effect, that he installed plaintiff in this apartment in order to make it possible for her to live a relatively respectable life during her pregnancy and that he only agreed to maintain her in this fashion and pay all the medical and hospital bills surrounding her maternity on condition that she place the child for adoption when it was born.

They fabricated a whole story concerning their marriage, and defendant's employment, showing extensive travel on his part in order to explain his general absence from the apartment. Both admitted that it was a fiction planned in order to have a consistent story to tell neighbors without having to go into personal relationships. Plaintiff insisted, however, that the date of the marriage, as written in a notebook in defendant's own handwriting, was factual. Defendant denies that the date was factual, testifying that nothing in

the story was true except his place of employment. He never did travel for any length of time. He stated that the month of August was arbitrarily selected in order to establish a date of marriage prior to her pregnancy, and it was purely coincidental that it happened to agree with the period of her hospital confinement in McKeesport. He could not remember whether or not the 18th day of August was actually selected to indicate a date of marriage. In this respect, it is noted that those figures "18" did bear signs of alteration which were not explained by either party.

Frictions developed between the parties after the child was born. Plaintiff contacted defendant's minister, his parents and some friends they had made in Johnstown in order to bring pressure upon defendant to marry her. She insisted that she was concerned with a ceremonial marriage, or remarriage, for the sake of the child. It is noted on this point that she introduced herself by her maiden name when she called at the home of his parents.

This case has much in common with the case of Stevenson's Estate, 272 Pa. 291. In that case, prior to his death, decedent maintained a woman in an apartment in another neighborhood of the same city. Following his death, she claimed to be his widow, and entitled to a share in his estate. The court denied her claim on facts basically similar to these, holding that she was merely his kept mistress. In adopting a quotation from Justice Sharswood in Bicking's Appeal, 2 Brewster 202, the court said:

" 'A man may live with his kept mistress in such a way as to create a kind of repute of marriage among some persons; he may even, to gratify her, allow himself to be held out, or hold himself out, to her friends and acquaintances, as her husband, may be a constant visitor, sleep and often eat at her house, may recognize the fruit of the connection as his

children, and manifest affection and tenderness toward them; yet the evidence may fall far short of that which ought to satisfy the mind that there was an actual agreement to form the lawful relation of husband and wife. The conduct of the parties must be such that almost anyone acquainted with them would naturally infer that they bore that relation to each other.' "

There is one further aspect of this case which should be mentioned, and that is the fact that the relation was illicit prior to the alleged marital contract. Since the relation was admitted to be illicit prior to the alleged marital contract, we could not presume a marriage without proof of a changed relationship: Wharton's Estate, 218 Pa. 296; Yardley's Estate, 75 Pa. 207. The evidence in this case on cohabitation and reputation is not strong enough to imply a marriage: Paterson's Estate, 237 Pa. 24; Hunt's Appeal, 86 Pa. 294; Pierce v. Pierce, 355 Pa. 175; Rosenberger Estate, 362 Pa. 153; Osterling's Estate, 323 Pa. 23.

Defendant's conduct in this affair is contemptible; baseness, however, cannot be substituted for proof. From our analysis of the whole record, we find that plaintiff has failed to sustain her burden of proving a marriage to defendant. Were defendant possessed of any dignity or sentiment he would make himself a husband to his lover and a father to his child. He has chosen to discard his mate, cast out his son and to travel the road to opulence and melancholy. Nonetheless, defendant never accorded the status of a wife to plaintiff; she exhibited doubts about the marriage herself. She was 28 years old at the time of the hearing; she had attended college. Plaintiff had been married before and had a child by her first marriage. She knew the attributes of true marriage but was content to accept something less from defendant.

For these reasons, the complaint will be dismissed.

484

*Order*

And now, to wit, February 7, 1961, a decree of divorce is refused and the complaint dismissed.