## Evans Estate

*Dewey Hoffman*, for appellant.

*Irvin Stander*, for Commonwealth.

KLEIN, P. J., June 3, 1963.—Thomas Evans, the decedent, died October 16, 1961, leaving a will dated July 17, 1937. In the will, in which he refers to himself as Thomas S. O. Evans, he stated that he was "now residing at 865 North Beechwood Street, Philadelphia", he left his entire estate "to my dear friend, Viola M. Graham, now residing at 865 North Beechwood Street, Philadelphia", and named her executrix.

The register of wills filed an inheritance tax appraisement on September 24, 1962, in which tax was assessed at 15 percent on decedent's net administered estate, valued at $105,881.20; United States Savings Bonds, registered in the name of decedent or Viola M. Graham, having a value of $11,840.12, and United States Savings Bonds, registered in the name of decedent, payable on death to Viola M. Graham, valued at $3,561.84. The total tax assessed on these items was $18,192.48.

Viola M. Graham has appealed from this appraisement, contending that she was the common-law wife of decedent and hence the administered estate should have

been taxed at 2 percent, instead of 15 percent, and that no tax was due on the United States Savings Bonds, registered in the name of decedent or Viola M. Graham, as they were held as tenants by entireties and were therefore exempt from the application of the joint property Inheritance Tax Act. The Commonwealth filed a responsive answer denying that Viola M. Graham, or Evans, was decedent's wife.

The matter came on for hearing on February 13, 1963, and April 10, 1963.

Viola M. Graham (Evans) was the principal witness in support of her contention that she was decedent's common-law wife.

She testified that she met the decedent in 1918 and that they were friends and would go out together, once a week, until 1937; that she and decedent had talked about getting married, but that she worked for the Bell Telephone Company and would have been required to resign if she had married decedent, and since she wanted to continue to work, they did not get married.

Witness testified that the common-law marriage between her and decedent took place in July or August, 1937, shortly after he bought the house on Beechwood Street. "He asked me if it was all right if I was willing to live there with him as Mrs. Evans. I said, yes, it was perfectly all right with me." She further testified that decedent purchased the Beechwood Street home and gave her a ring, and that thereafter she lived with decedent as man and wife, cooked the meals, did the laundry, and performed the normal and usual duties of a wife until decedent's death in 1961.

On cross examination, the witness said that she had discussed legal marriage with decedent before he came to live at Beechwood Street, "But on account of me working at the telephone company I was afraid to get married. I thought I would lose my job, and I needed it." She continued working for the telephone company

until 1956 and told decedent at different times her desires for a civil or religious ceremony, and decedent promised there would be one, but he was too ill and she did not want to press the question further. She quoted decedent as saying that "some day we would have a ceremony", but as far as he was concerned it didn't make any difference.

No children were born of the alleged marriage.

In her testimony, appellant admitted that she knew that decedent's will, made in 1937, referred to her as "my dear friend Viola M. Graham", but that she never asked him to change this reference in the will, although the will was kept in the house from 1937 to the date of decedent's death.

In further support of her contention that she lived with decedent as wife and husband, appellant attempted to establish proof of reputation and co-habitation by the testimony of four witnesses, Thomas Kerr, his wife, Anna Kerr, and Charles Yost, and his wife, Bertha Yost. These witnesses were social friends of decedent and Viola Graham, the two women having worked with her at the telephone company. They testified that they assumed that decedent and the appellant were married, because they had lived together and went out together, although they did not have knowledge that they were actually married.

From their testimony it appears that they thought the couple were regarded as man and wife in the neighborhood where they lived, but it was evident that this question had not been really raised or discussed by or among them.

A careful study of this entire record leads the hearing judge to the conclusion that Viola M. Graham, or Evans, has not met the burden which is placed upon her of establishing that decedent contracted a common-law marriage with her. See Stauffer Estate, 372 Pa. 537 (1953) ; Davis' Estate, 204 Pa. 602 (1903).

In Manfredi Estate, 399 Pa. 285 (1960), Mr. Chief Justice Bell said at page 292:

". . . The law, of necessity, imposes a heavy burden on one who grounds his claim on an allegation of common-law marriage. As said by President Judge Keller in Baker v. Mitchell, 143 Pa. Superior Ct. 50, 54: 'The law of Pennsylvania recognizes common-law marriages. But they are a fruitful source of perjury and fraud, and, in consequence, they are to be tolerated, not encouraged; the professed contract should be examined with great scrutiny, and it should plainly appear that there was an actual agreement entered into, then and there, to form the legal relation of husband and wife.' "

To constitute a valid marriage there must be a contract *per verba de praesenti*, uttered with a view to establishing the relationship of husband and wife: Blecher Estate, 381 Pa. 138, 142 (1955). In the present case, according to the testimony of appellant, decedent asked her "if it was all right if I was willing to live there with him as Mrs. Evans", and she replied ". . . yes, it was perfectly all right with me." This does not meet the requirements of our law and fails to establish a marriage contract by words *in praesenti*.

In Murdock's Estate, 92 Pa. Superior Ct. 275, 277, one of the leading cases in this state on the subject of common-law marriages, Judge Keller said:

". . . But the claimant testified to the precise form of the contract of marriage between her and the decedent, and by this she must stand or fall. If the alleged conversation constitutes a contract of marriage, evidence of cohabitation and reputation is received in corroboration of her testimony that a marriage contract was in fact entered into. But if she herself proves that no valid marriage contract was actually entered into between them, evidence as to cohabitation and reputation goes for nothing: Tholey's App., 93 Pa. 36, 38;

Grimm's Est. 131 Pa. 199, 202. As was said by our Supreme Court in Bisbing's Est., 266 Pa. 529, 531, reaffirming Hunt's App., 86 Pa. 294, 297, 'Cohabitation and reputation are not marriage; they are but circumstances from which a marriage may be presumed, but such presumption may always be rebutted and will wholly disappear in the face of proof that no marriage in fact had taken place.' "

See also Nikitka's Estate, 346 Pa. 63 (1943).

Moreover, where, as in the present case, one of the parties to the alleged common-law marriage is dead, the testimony of the surviving party must be scrutinized carefully and received with great caution. See Stevenson's Estate, 272 Pa. 291 (1922).

Appellant failed to impress the hearing judge favorably and her testimony was inconsistent and contradictory with respect to several important items. She testified, for instance, that the Bell Telephone Company, where she worked, had a policy of discharging married women in 1937 and therefore she was afraid of losing her job. The record clearly discloses that commencing in 1940 the company was faced with a shortage of female help and reversed its earlier policy. Appellant worked for the company until 1956 without making known that she was married. This fact certainly belies her explanation. She also testified that the reason their marriage was not formalized by a civil or religious ceremony was the fact that decedent was too ill. By her own admissions, however, it is crystal clear that, with the exception of short periods of illness, decedent was well enough to engage actively in business for practically the entire period that they lived together.

The hearing judge is satisfied that appellant is not telling the complete truth and that there must have been some impediment to their marriage, which she has not disclosed. Decedent was born in Albania. His real

name was Suder and he was a Russian Orthodox Catholic. Appellant is obviously American born and attends a Presbyterian church. There can be no question that decedent lived with her for almost 25 years and was extremely fond of her. This is demonstrated by the fact that he left his entire estate to her. Nevertheless, it seems clear that they were never married.

Even if appellant's allegations had met the technical requirements of the law to establish a common-law marriage, the hearing judge could not have given credence to her uncorroborated testimony under the peculiar circumstances of this case. And it is especially noteworthy that although she claims to have lived with decedent as wife and husband for almost a quarter of a century, she was unable to produce a single item of documentary evidence to support her claim.

The conduct of the parties during the period they lived together completely negatives appellant's contention that they were married. On the contrary, almost everything they did suggested a meretricious relationship, not a marriage.

In the first place, the will made in 1937, refers to her as "my dear friend". This was never changed. Most married couples in this community, who own the home in which they live, hold title as tenants by the entireties. Title to premises, 865 North Beechwood Street, was in decedent's name, alone, from the time he purchased it in 1937 until the day he died in 1961. Her social security registration has always been in the name of "Graham", not "Evans", and decedent, who was her beneficiary was designated as "friend". She always used the name "Graham" with her employer, the Bell Telephone Company, and decedent was designated beneficiary in her group insurance policy with the company as "Thomas Evans, friend" as late as 1961, the year he died. They both filed separate income tax returns as single persons, she using the name

"Graham". This practice continued for the five years after she terminated her employment from 1956 to 1961. Perhaps the most convincing evidence that the parties were not married in 1937, as appellant contends, is the fact that in 1941, 1942, 1943, 1944, 1945, and, later, in 1954, decedent purchased various United States Savings Bonds and registered some of them in his name "or Violet M. Graham", others in his name "or Violet Graham", and still others in his name "P. O. D. to Violet M. Graham".

Surely it is not necessary to pursue the analysis of this record further in order to reject appellant's unsupported version of an alleged marriage and to conclude that the decedent never contracted a marriage of any kind, civil, religious or common-law, with her. The hearing judge so finds as a fact and enters the following

### Decree

And now, June 3, 1963, the appeal of Viola M. Graham Evans, also known as Viola M. Graham, is dismissed and the record is remitted to the register of wills.