**In re Estate of John Michael Noll Sr.**

C.P. of Berks County, no. 72559.

*William J. Gallagher,* for administratrix.
*John Paul Simpkins,* for guardian ad litem.

SCHMEHL, *J.,* March 13, 1995—In this matter, the court must decide whether a common-law marriage existed between the decedent, John Michael Noll Sr., and Dianne L. Riffey. Riffey seeks status as the decedent's common-law spouse so that she may receive an intestate share of the decedent's estate and be entitled to the family exemption.

This matter was originally heard in the Orphans' Court Division of the Court of Common Pleas of Philadelphia, but was transferred to Berks County on August 10, 1994 as the decedent was a resident of Berks County and letters of administration had been issued by the Register of Wills for the County of Berks.

On December 3, 1993 Dianne L. Riffey, the administratrix for the estate of John Michael Noll Sr., filed her first and final account. The account, under "receipts," shows $499,886 as a settlement amount received pursuant to an order of the Honorable Alex Bonavitacola in *Dianne L. Riffey, Administratrix of the Estate of John Michael Noll Sr., Deceased and Dianne L. Riffey in her own right v. United Parcel Service Inc. and Michael Joseph Konnick,* the action filed as a result of the decedent's death. A note to this entry states that "Pursuant to the court order dated October 29, 1993, $10,000 of this amount is apportioned to the survival action and $340,000 to the wrongful death action. The balance will be apportioned after the marital status of Dianne

L. Riffey is determined."[1] On February 18, 1994 Riffey filed a restated account for the estate of John Michael Noll Sr. This account listed only the $10,000 amount apportioned to the survival action in the previous account.

In March 1994 John Paul Simpkins, Esquire, guardian ad litem for the parties' minor child, John Michael Noll Jr., filed a petition for discovery to gain information about the financial and other affairs of the decedent and Riffey. Riffey, in April of 1994 also petitioned for leave of court to take discovery for the purpose of providing testimony to substantiate her claim that she and the decedent were husband and wife. The matter was heard by the Honorable Kathryn S. Lewis, Court of Common Pleas of Philadelphia, Orphans' Court Division, on June 13, 1994.

On February 6, 1995 a stipulation by counsel for Riffey and the guardian ad litem was filed allowing this court to render a decision based upon the transcript of the June 13, 1994 hearing to determine the legal status of Riffey as the putative common-law spouse of the decedent.[2] The court recognizes the inherent problems of deciding a case such as this solely on a cold record. However, after reviewing the transcript and the record transmitted from Philadelphia, this court has determined that it is, in fact, able to make a decision on this matter based upon these documents.

The facts, as gleaned from the record, are as follows. Riffey and the decedent met at their place of employment in 1987. (N.T., p. 86.) That same year they began to

---

1. The record before this court does not contain a copy of the order of October 29, 1993.

2. The delay in this court's decision was due to the stipulation not bringing the matter before the court prior to February 1995.

reside together, at first with the decedent's mother in Fleetwood, Pennsylvania. They moved into their own apartment in 1991. (N.T., p. 89.) They entered into a lease on their apartment together, under the names of John M. Noll and Dianne Riffey. (Exhibit A-6, referenced at N.T., pp. 90-91.) Riffey and the decedent had a joint bank account under the names of Dianne Riffey and John Michael Noll. (N.T., p. 102.)

Riffey testified she considered herself to be married to the decedent at the time of her son's birth, but did not consider herself married to him prior to giving birth to her son. (N.T., pp. 100-101.) Riffey never named the decedent as her beneficiary on her life insurance policy nor did she ever name the decedent as her husband on her health insurance, explaining that he had his own insurance. (N.T., p. 103.) To the best of Riffey's knowledge she was not named as spouse on the decedent's insurance policy with his employer. (N.T., p. 106.) Riffey stated she never received any correspondence from anyone as "Mrs. John Michael Noll" but had been referred to as Mrs. John Michael Noll by her son's doctor. (N.T., p. 111.) She and the decedent did not file income tax returns together as husband and wife. (N.T., p. 112.) When asked under what circumstances she held herself out as the wife of the decedent she stated "I just feel like my everyday living was representation enough of me being Mrs. Noll." (N.T., p. 112.)

At trial, three witnesses testified as to their knowledge of a common-law marriage between Riffey and the decedent. John Douglas Jeffreys owned the business where both Riffey and the decedent were employed. He believed the decedent and Riffey were married. Jeffreys stated that prior to the birth of the decedent's son, he asked the decedent if he intended to marry Riffey, at which point the decedent stated he considered himself

already to be married to Riffey but had no intention of engaging in any public ceremony. (N.T., p. 8.) At another time, Jeffreys had to discipline Riffey for some infraction of company rules and the decedent paced outside the room where this was occurring. When Jeffreys told the decedent that the matter was not any of his business, the decedent told Jeffreys that any matter that concerned his wife was a matter concerning him. This occurred after the birth of their child. (N.T., pp. 20-21.) At social gatherings the decedent had told people to keep their eyes off of his wife, referring to Riffey. (N.T., p. 10.) Jeffreys also testified that he was unaware of any specific records that listed Riffey as the decedent's wife. Jeffreys also testified that his company had a very strict rule that no employee was allowed to receive the paycheck of another employee, but that the decedent and Riffey did enjoy this benefit. (N.T., pp. 25-26.)

Steven Scott Cinesi also testified. Cinesi knew the decedent and Riffey. Cinesi testified he believed that the decedent and Riffey were husband and wife, but his best recollection to support this was that the decedent would make occasional references to Riffey such as "the ball and chain" or "the better half." (N.T., p. 40.)

Marjorie Lambert, Riffey's sister, testified that she considered the decedent and Riffey to be husband and wife (N.T., p. 67), basing this on the fact that they were "family," and that one could tell that they loved each other, the same as she felt toward her own husband. (N.T., p. 68.) The decedent, in discussing his relationship with Riffey, stated to Lambert that Riffey was "his old lady." (N.T., p. 68.) Lambert stated she believed the term "old lady" means wife. (N.T., p. 69.) Lambert stated that the reputation of the decedent and Riffey was that they were husband and wife amongst her family.

(N.T., p. 70.) However, Lambert had no recollection of the decedent ever telling her that her sister, Riffey, was his wife, nor does she have any recollection that Riffey said the decedent was her husband. (N.T., p. 74.) Lambert first presumed that Riffey and the decedent were married after the birth of their child. (N.T., p. 74.)

While a common-law marriage is generally acceptable in Pennsylvania, it is a matter to be tolerated and not encouraged. A common-law marriage is subject to great scrutiny, and a heavy burden is imposed upon the one who grounds a claim on an allegation of common-law marriage, especially where one party is dead and the claim is to share in the decedent's estate. *In re Estate of Stauffer,* 504 Pa. 626, 629, 476 A.2d 354, 356 (1984). The decedent was killed in a motor vehicle accident, leaving behind a child and Ms. Riffey. Despite these tragic circumstances and the compassion the court has for Ms. Riffey, there is insufficient evidence to find that a common-law marriage existed. "When the lips of a man are sealed by death, and he leaves no satisfactory evidence as to the existence of such [common-law marriage] contract, courts will be very slow to establish it in derogation of the undoubted rights of those who follow him." *Manfredi Estate,* 399 Pa. 285, 292, 159 A.2d 697, 701 (1960). (citations omitted)

Words in praesenti are usually required to establish a common-law marriage relationship (see *McGrath's Estate,* 319 Pa. 309, 179 A. 599 (1935)), but due to the difficulty in proving such words in praesenti, a rebuttable presumption of marriage has been created where two "absolutely essential" elements exist: constant (not irregular or inconstant) cohabitation *plus* a reputation of marriage which is not partial or divided but is broad and general. *In re Estate of Rees,* 331

Pa. Super. 225, 228, 480 A.2d 327, 328 (1984); *Manfredi Estate, supra* at 291, 159 A.2d at 700. In the present matter, there is absolutely no evidence of any words in praesenti being exchanged between the decedent and Ms. Riffey. There was never, ever, a ceremony of any kind. Thus, in order for there to be found a common-law marriage, it must be shown that the decedent and Ms. Riffey had constant cohabitation and a reputation of marriage. In the *Rees* case the court stated:

"Cohabitation and reputation ... do not create the marriage but rather are circumstances giving rise to a rebuttable presumption of one. *Wagner Estate,* 398 Pa. 531, 533, 159 A.2d 495, 497 (1960); *Manfredi Estate, supra,* 399 Pa. at 291, 159 A.2d at 700; *Nikitka's Estate,* 346 Pa. 63, 29 A.2d 521 (1943). Moreover, the rule which permits a finding of marriage duly entered into based upon reputation and cohabitation alone is one of necessity to be applied only in cases where other proof is not available. *Nikitka's Estate, supra,* 346 Pa. at 65, 29 A.2d at 522." *Rees, supra* at 228, 480 A.2d at 328. (footnote omitted)

There is no question that the parties resided together constantly and regularly with each other from 1987 up until the decedent's death in 1991. The first prong for a presumption of common-law marriage is easily met in this matter. However, there is a dearth of information regarding their reputation as having been married.

In support of her case, Riffey submitted an affidavit by Linda Kreider, a co-worker of Riffey and the decedent. Kreider's affidavit states that, based upon her observations and discussions, she knew that the decedent and Riffey lived together for a long period of time, had a son together, and maintained joint bank accounts and used their com-

bined incomes for shared living expenses and such. She further stated "Based on my observations and discussions I had with John Michael Noll and Dianne Riffey, I considered them to be husband and wife." An additional affidavit by Robert P. Matthews was submitted in support of Riffey's case. Matthews was a friend of the decedent and Riffey. This affidavit also stated that he observed the decedent and Riffey sharing a residence, having a son together and sharing expenses paid out of joint accounts and that he also considered the decedent and Riffey to be husband and wife.

The strongest testimony regarding the decedent and Ms. Riffey's reputation as having been husband and wife came from John Michael Jeffreys, their mutual employer, who stated that the decedent considered himself to be married to Riffey but had no intention of engaging in any public ceremony, and that the decedent had referred to Riffey as his wife. Jeffreys also submitted an affidavit prior to testimony, but was the only affiant to actually testify at the hearing.

The trial transcript indicates that counsel stipulated that the affidavits of Kreider and Matthews were submitted to the court with the understanding that the affiants would testify if they were called in accordance with their affidavits, although there was no admission that the testimony was true. (N.T., p. 83.) Those affidavits, while they contain information that would be somewhat helpful in discerning whether or not a common-law marriage existed, are not convincing as they are very general and rather vague in nature. Thus even taking the assertions in them to be true, they do not provide to this court the strong information necessary to find that a common-

law marriage existed. The parties did in fact live together for a long time, but the beliefs of those who testified or produced affidavits that the decedent and Riffey were married seem based more upon their presumptions than any actual knowledge of a marriage. And despite agreement of counsel, the record does not have the benefit of cross-examination.

Jeffreys alone gave testimony that the decedent referred to Riffey as his wife. None of the other witnesses for Riffey had specific recollections of the decedent referring to Riffey as his wife. Even Riffey stated that she only considered herself to be married to the decedent after her son was born, and that she never named the decedent as a beneficiary on any type of insurance policy, nor did she ever receive correspondence from anyone as Mrs. Noll. The only individual she could name who had ever referred to her as Mrs. Noll was her son's doctor.

While there is ample evidence that Riffey and the decedent lived together for a long period of time, there is not sufficient evidence of a broad reputation that they were husband and wife. "The mere fact that they [the alleged contracting parties] were known to a few people as man and wife is not sufficient evidence to establish marriage." *Manfredi, supra* at 292, 159 A.2d at 700. Furthermore, there is evidence in the record that contradicts the existence of a common-law marriage. The petition for grant of letters does not list any spouse, and was signed by Riffey, although there is a note that letters were being taken out for purposes of litigation. However, the certificate of death lists the decedent's marital status as "never married;" the informant was the decedent's own mother, Minnie Noll. Additionally, a renunciation

was signed by Minnie Noll asking that letters of administration be issued to Riffey "mother of the minor sole heir of the decedent" not wife or other such designation.

Riffey argues that there should be presumed to have been a marriage because of the question of legitimacy of her child, but any presumption of marriage where there is a question of legitimacy of a child involved would seem, to this court, to be put in place to protect the child, and not to benefit the surviving purported spouse. If this was a situation where the minor child would himself suffer loss or harm if a common-law marriage was not found to exist, the balancing and evaluations might be different, although the result might not differ.

The correct focus of this case was aptly summarized by the guardian ad litem for the child in his closing statement. The court joins in his respect for the relationship that Ms. Riffey has with her son and the relationship that she had with the decedent and does not wish to "tarnish her feelings for that relationship and her memories." This court's primary responsibility is to assess whether or not a common-law marriage existed, and that this assessment directly impacts what is best for the child.

For the foregoing reasons, the court enters the following order.

## ORDER

And now, March 13, 1995, the court finds that a common-law marriage does not exist nor ever existed between the decedent, John Michael Noll, and Dianne Riffey.

In re Anonymous No. 76 D.B. 92

Disciplinary Board Docket no. 76 D.B. 92.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

LEONARD, *Member*, October 4, 1994—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

Respondent was suspended from the practice of law in the Commonwealth of Pennsylvania by Supreme Court order dated August 12, 1992, pursuant to Rule 214(d), Pa.R.D.E. Respondent's suspension resulted from his May 31, 1991 judgment of conviction in federal court on all counts of a four-count indictment: making a false statement as to material facts in a matter within the jurisdiction of the United States Department of Justice, in violation of 18 U.S.C. §1001; making a false oral statement as to material facts in a matter within the jurisdiction of the United States Department of Justice, in violation of 18 U.S.C. §1001; conspiracy to possess cocaine, in violation of 21 U.S.C. §846; and, possession of cocaine in violation of 21 U.S.C. §844.

Respondent was sentenced to a term of imprisonment of 16 months. After sentence was imposed, respondent appealed to the United States Court of Appeals for the Third Circuit which affirmed the judgment of conviction but vacated the sentence and remanded to the district court for resentencing. Respondent was resentenced to an identical 16 month term and fined $10,000— later modified to eight months imprisonment and eight months home confinement.

On March 11, 1993, the Office of Disciplinary Counsel filed a petition for discipline against respondent based on his May 1991 conviction. Respondent filed a timely answer on March 24, 1993.

The matter was referred to Hearing Committee [    ] chaired by [    ], Esquire and included [    ], Esquire and [    ], Esquire.

The committee held a hearing on October 22, 1993 and recommended that respondent be suspended from the practice of law for a period of three years, retroactive to the date of temporary suspension, August 12, 1992. Neither party filed exceptions.

The matter was referred to the Disciplinary Board and adjudicated on June 22, 1994.

## II. FINDINGS OF FACT

The board adopts the findings of fact made by the Hearing Committee which were based upon the stipulations presented by petitioner and respondent:

(1) Petitioner, whose principal office is located at Suite 400, Union Trust Building, 501 Grant Street, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207, Pa.R.D.E., with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) The respondent, [    ], was born on June 4, 1943, and was admitted to practice law, in the Commonwealth of Pennsylvania on October 5, 1970. He resides at [    ].

(3) From 1984 until 1986, respondent was [A] to the [B].

(4) On various occasions between December 1984 and January 1988, respondent possessed and used cocaine in violation of 21 U.S.C. §844(a).

(5) Respondent was never addicted to cocaine. He used the drug in the company of friends and acquaintances in social situations.

(6) From September 6, 1988, to May 12, 1989, the respondent served as an [C] to [D] in Washington, D.C.

(7) In this position respondent acted as a liaison with law enforcement agencies and carried out general assignments given to him by [D] which related to pending matters within the criminal and intelligence communities.

(8) In this position, respondent had access to sensitive information relating to intelligence and law enforcement areas.

(9) Before assuming his duties as [C] respondent completed Standard Form 171, entitled "Application for Federal Employment."

(10) This form included questions regarding prior criminal convictions but does not address any uncharged or unadjudicated criminal conduct.

(11) In addition, persons appointed to sensitive positions in the [E] are usually required to complete Standard Form 86 prior to taking the position. This form includes specific questions concerning the applicant's drug use and offers a warning to the applicant that failure to provide truthful answers could result in criminal prosecution.

(12) Respondent completed the SF-86 form six days after entering on duty as [C] to [D]. In response to the question, "Do you now use or supply, or in the last five years, have you used or supplied marijuana, cocaine, narcotics, hallucinogenic, or other dangerous

or illegal drugs?," respondent typed an "X" beneath the word "No." Respondent signed the SF-86, certifying that his answers were true.

(13) On November 1, 1988, respondent was interviewed by a special agent of the Federal Bureau of Investigation. The special agent reviewed the questions on the SF-86, and specifically asked respondent if he had ever used illegal drugs. Respondent stated that he had not.

(14) The security officer of [D's] office relied upon respondent's statements on the SF-86 to grant him a temporary security clearance, and on respondent's statement to the special agent in granting him a final security clearance.

(15) Respondent resigned his position with [D's] office on April 27, 1989, effective May 12, 1989.

(16) On August 10, 1990, a grand jury of the United States District Court for the [ ] District of Pennsylvania issued a four-count indictment against the respondent charging him with violations of:

(a) Count I: Making a false written statement as to material facts in a matter within the jurisdiction of the United States Department of Justice, in violation of 18 U.S.C. § 1001, regarding respondent's false statement in his answer on the SF-86 form. The date of this alleged statement was September 12, 1988.

(b) Count II: Making a false oral statement as to material facts in a matter within the jurisdiction of the United States Department of Justice, in violation of 18 U.S.C. § 1001, regarding respondent's false statement to the special agent of the Federal Bureau of Investigation. The date of this alleged statement was November 1, 1988.

(c) Count III: 21 U.S.C. §844(a), regarding respondent's combination with others to possess cocaine, between December 1984 and January 1988.

(d) Count IV: 21 U.S.C. §846, regarding respondent's possession and use of cocaine, alleged to have occurred on April 8, 1989.

(17) The charges against respondent were docketed to no. [    ] in the United States District Court for the [    ] District of Pennsylvania.

(18) Respondent pleaded not guilty to all charges and the matter went to trial beginning February 4, 1991, and ending February 7, 1991.

(19) Respondent went to trial on advice of counsel to preserve legal issues for appeal and not to contest factual guilt.

(20) At respondent's trial, [D] testified that if he had known about respondent's drug use, he would not have made respondent part of his staff.

(21) [D] also testified at respondent's trial that respondent was an "excellent lawyer who always fulfilled the responsibilities that were given to him."

(22) [F], counsel for [E] testified at respondent's trial concerning the involvement of respondent in reviewing foreign intelligence security matters for [D]. [F] testified that she had no reason to believe that respondent had ever improperly disclosed any information he received. She further testified that while respondent served at the [E] that she enjoyed a "fine professional relationship" with him and that respondent handled his responsibilities in a "very professional, very cordial" manner.

(23) On February 7, 1991, the jury in respondent's trial returned a verdict of guilty as to all counts.

(24) On May 31, 1991, the Honorable [G], United States District Judge, entered a judgment of conviction and sentenced respondent to imprisonment for terms of 16 months each as to Counts I and II and 12 months each as to Counts III and IV, all concurrent, for a total sentence of imprisonment for 16 months.

(25) The sentencing court, as well as the probation office, found no evidence that respondent had in any way abused or otherwise compromised the responsibilities of his office.

(26) The sentencing court found that respondent's high-ranking position in the [E] was an aggravating factor for sentencing purposes.

(27) On June 6, 1991, respondent filed a notice of appeal to the United States Court of Appeals for the Third Circuit.

(28) Respondent resigned from his law firm on March 22, 1990 and has not practiced law since that time.

(29) On May 15, 1992, the United States Court of Appeals entered a decision affirming the respondent's judgment of conviction. The Court of Appeals determined that respondent's sentence should be vacated, however, and remanded the matter to the district court for resentencing.

(30) On January 8, 1993, respondent appeared before the United States District Court for sentencing and was sentenced to a total of 16 months imprisonment and a fine of $10,000.

(31) On January 15, 1993, the United States District Court modified respondent's sentence of imprisonment to eight months imprisonment and eight months home confinement.

## III. CONCLUSIONS OF LAW

Respondent's conviction represents an independent basis for the imposition of discipline under Rule 203(b)(1), Pa.R.D.E.

By his conduct which resulted in convictions on Counts I and II of the indictment, relating to false statements in the course of his background investigation, respondent violated the following Rules of Professional Conduct:

(a) R.P.C. 8.4(b), which provides that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects.

(b) R.P.C. 8.4(c), which provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

(c) R.P.C. 8.4(d), which provides that it is professional misconduct for a lawyer to engage in conduct prejudicial to the administration of justice.

By his conduct which resulted in conviction on Count III of the indictment, relating to conspiracy to possess cocaine, respondent violated the following Disciplinary Rules of the Code of Professional Responsibility, in effect prior to April 1, 1988:

(a) D.R. 1-102(A)(3), which prohibits a lawyer from engaging in illegal conduct involving moral turpitude;

(b) D.R. 1-102(A)(5), which prohibits a lawyer from engaging in conduct prejudicial to the administration of justice; and

(c) D.R. 1-102(A)(6), which prohibits a lawyer from engaging in conduct adversely reflecting on fitness to practice law.

By his conduct which resulted in conviction on Count IV of the indictment, relating to possession of cocaine, respondent violated the following Rules of Professional Conduct:

(a) R.P.C. 8.4(b), which provides that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects.

(b) R.P.C. 8.4(d), which provides that is professional misconduct for a lawyer to engage in conduct prejudicial to the administration of justice.

## IV. DISCUSSION

Because the parties have stipulated to the facts relative to criminal convictions and the resulting infractions of the Disciplinary Rules, this matter, like many before the board, implicates only the extent of discipline to be imposed. The issue of the sanction warranted as a result of a criminal conviction is adjudicated on a case-by-case basis and the discipline is tailored by the severity of the crime after consideration of aggravating and mitigating circumstances.

The public prominence of the respondent in combination with his narcotics and false statement convictions presents a unique factual backdrop to the question of the appropriate level of discipline. The stipulated facts actually outline three independent grounds for punishment—misconduct by an attorney in a position of public authority, conviction for drug possession and conviction of making false statements to government authorities. However, both Disciplinary Counsel and the Hearing Committee viewed the narcotics convictions as the foundation for the discipline and considered the abuse of public office and the false statement convictions as aggravating building blocks. While we cannot stress

too emphatically the disdain attendant to respondent's lying, not once, but twice, to [E] officials, we will not take issue with the posture of the case as presented by the Disciplinary Counsel.

We turn initially to the impact of respondent's drug possession convictions.

Respondent has admitted to some 12 instances of cocaine use over approximately four years. During this time, respondent spent some time in private practice, held a high position in state government and, as mentioned, served as an [C] to [D]. The disciplinary implications of respondent's cocaine use while serving as a prosecutor and while holding public office are discussed, *infra*.

In *Office of Disciplinary Counsel v. Simon,* 510 Pa. 312, 507 A.2d 1215 (1986), an attorney was disbarred on the basis of two convictions for cocaine distribution. Using sweeping language to describe its intolerance for drug-related attorney offenses, "even minor violations of [the] law ... tend to lessen public confidence ..." *id.* at 319, 507 A.2d at 1219, the Pennsylvania Supreme Court stopped short of announcing a *per se* disbarment rule for drug convictions. The court's pronouncement in *Simon* has nonetheless been cited as the authority for imposition of serious discipline in matters which, prior to *Simon,* may have called for some leniency. Its holding has also not been confined to drug distribution cases. In a recent board decision, *In re Anonymous No. 27 D.B. 90,* 17 D.&C.4th 12 (1992), although a very small amount of cocaine was involved in the possession and persuasive mitigating circumstances may have otherwise indicated private discipline, the board was constrained by *Simon* to recommend a public censure. In doling out its censure, the Supreme Court informed respondent that only his past positive con-

tributions to the legal system saved him from disbarment.

In *In re Anonymous No. 62 D.B. 85,* 49 D.&C.3d 504 (1987) respondent was convicted on five counts of possession of cocaine. The board disputed respondent's characterization of his conduct as private and, citing the impairment to public trust, imposed an 18 month suspension. The Supreme Court disagreed and extended the suspension to five years.

Despite the edict of *Simon,* attorneys involved with drug possession encounter a wide spectrum of disciplinary dispositions. See *e.g., In re Anonymous No. 42 D.B. 87,* 5 D.&C.4th 613 (1987) (attorney testifying as government witness but not charged with drug offense privately reprimanded); *In re Anonymous No. 62 D.B. 85,* 49 D.&C.3d 504 (1987) (five-year suspension based on five-count possession conviction). Some mitigating factors considered in the varying degrees of discipline are: addiction, *In re Anonymous No. 37 D.B. 88,* 50 D.&C.3d 526 (1989); extensive emotional distress, *In re Anonymous No. 100 D.B. 88,* 12 D.&C.4th 60 (1990); and, cooperation with the government, *In re Anonymous No. 124 D.B. 89,* 12 D.&C.4th 417 (1991).

Respondent never sold or distributed cocaine, thus, we are not required to recommend disbarment as *Simon* can possibly be construed to compel. Rather, respondent's case is properly guided by precedent involving drug use by a prosecutor and misconduct by a holder of public office. In both instances, a higher expectation of integrity is imposed and lack of faithfulness to that ethic brings a congruent aggravation of discipline.

We look first to disciplines imposed when the convicted attorney is, has, or will serve as a prosecutor. Instances of drug use involving prosecuting attorneys implicate a further breach of the public trust justifying

for aggravated sanction. In *In re Anonymous No. 60 D.B. 83,* 33 D.&C.3d 187 (1984), the respondent, an assistant district attorney, was a "social user" of cocaine and a fraternizer of drug dealers. The board characterized the respondent's conduct as condoning drug use and recommended a one-year suspension.

In *In re Anonymous No. 3 D.B. 89,* 18 D.&C.4th 490 (1993), the respondent was scheduled to start a position as an assistant district attorney when he was arrested as part of a drug prosecution. The board considered respondent's addiction and severe family problems in mitigation and recommended a five-year suspension. A dissent, however, argued for disbarment because, in part, of respondent's impending employment as a prosecutor, a factor apparently not considered by the majority.

These cases indicate that prosecuting attorneys, specifically entrusted with protection of the public, are deserving of a more severe penalty when this duty is compromised by the attorney's own inability to uphold the law.

Respondent claims that he was not serving as a prosecutor at the time of his cocaine use. For at least the admitted use in 1989, this assertion is simply without merit. Respondent's attempts to classify his [C] duties as administrative in nature do not diminish the fact that in 1989 respondent was the right hand to [D]—[   ]—law enforcement official in the nation. The specifics of respondent's responsibilities are not germane as it is the goal of maintaining the public trust which is of paramount concern. We thus consider respondent's position with [D] as invoking a higher degree of culpability for those offenses, such as the narcotics violations at issue here, which represent an egregious disregard for the laws attorneys are sworn to uphold.

Respondent's drug activity apparently occurred in conjunction with instances of excessive drinking and, in fact, respondent cites to an alcohol problem as a possible cause for his occasional flirtation with cocaine.

Respondent's position as a holder of public office in Pennsylvania, [A] to the [    ] and [    ], also imposed upon him a greater expectation to preserve the high standards of the legal system. *Office of Disciplinary Counsel v. Eilberg,* 497 Pa. 388, 441 A.2d 1193 (1982), instructs that attorneys holding public office are subject to an even higher standard in maintaining "public confidence in the integrity of the legal profession." *Id.* at 395, 441 A.2d at 1197. Eilberg, while a United States Congressman, rendered legal services to clients who had an interest in the outcome of Congressional action. Eilberg was suspended for five years for his conduct which was a violation of a federal conflict of interest statute.

Other instances involving breach of the public trust by attorneys in public office have exacted substantial penalties. In *In re Anonymous No. 72 D.B. 82,* 27 D.&C.3d 243 (1983), when a district attorney approved a criminal complaint which benefited a private client, he was suspended for two years. When, in *In re Anonymous No. 76 D.B. 83,* 47 D.&C.3d 138 (1987), a public defender accepted a gift from an individual represented by him in his official capacity, the Supreme Court ordered a three-year suspension.

As can be seen, misuse of public office is itself grounds for serious discipline. In the instant matter, however, it is clear that respondent's misconduct did not occur in the deployment of his public duties. Thus, we do not view this disregard of the public trust in its harshest light. Rather, we look to respondent's public role, acknowledged by respondent, as imposing an ele-

vated expectation of ethical conduct, a breach of which we consider as an aggravating factor.

The remaining question, which we view as significant, is the degree of aggravation wrought by respondent's convictions for the oral and written false statements provided to the [E] relative to respondent's employment with [D]. We are aware that, in some instances, not factually remote from respondent's case, disbarment has resulted when attorneys issue false statements to authorities. See *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981) (attorney disbared for filing false pleading and false driver's license application); *Office of Disciplinary Counsel v. Wittmaack,* 513 Pa. 609, 522 A.2d 522 (1987) (fabrication of evidence warrants disbarment); and, *Office of Disciplinary Counsel v. Holston,* 533 Pa. 78, 619 A.2d 1054 (1993) (forgery of divorce decree and denial of knowledge of same warrants disbarment).

Although there is no case on point precisely concerning lying to federal officials, if respondent was motivated solely by personal gain in denying his drug use, the disbarment penalty would not be unlikely. Respondent's convictions for these falsifications are totally aberrant to the esteem associated with the legal profession. Certainly respondent would not have passed [E] scrutiny if he answered truthfully. He, therefore, gained his employment by virtue of these false statements. We, nonetheless, accept respondent's explanation that he lied to the [E] to shield his political mentor from embarrassment. We cite this not as approval of a rationale, but only as an indicator that respondent's false statements were not primarily motivated by self-interest. Thus, we acquiesce in the Disciplinary Counsel's and Hearing Committee's consideration of these convictions as aggravating, rather than a distinct basis for discipline.

In mitigation, respondent has offered impressive testimony from his professional colleagues attesting to respondent's high principles and years of dedicated public service, all of which we credit.

We also note that in his years of public service, respondent apparently functioned competently indeed, even with distinction. In this vein, we reference the lack of evidence that respondent's drug use infiltrated his functioning in the work place or that, other than the obvious and damaging breach of public trust, any public harm resulted from his private misconduct.

Respondent did not raise the question of his possible alcoholism in mitigation, nor, without competent medical evidence, do we consider same.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent, [    ], be suspended for a period of three years retroactive to August 12, 1992.

It is further recommended that the court direct that respondent pay all of the necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Messrs. Schiller and Paris dissent and would recommend a five year suspension.

Board Members Kerns, Lieber and McGivern did not participate in the adjudication.

## ORDER

